John J. E. Markham, II (CA Bar No. 69623)
Email: jmarkham@markhamreadzerner.com
MARKHAM READ ZERNER LLC
One Commercial Wharf West
Boston, Massachusetts 02110
Tel: (617) 523-6329
Fax: (617) 742-8604

*Attorneys for Defendants/Counterclaimants*
*Blaine Laboratories, Inc. and Dr. Robert Blaine*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIVERA PHARMACEUTICALS, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>BLAINE LABORATORIES, INC., a California corporation, and DR. ROBERT BLAINE, an individual, et al.<br><br>Defendants.<br><br>BLAINE LABORATORIES, INC., a California corporation, and DR. ROBERT BLAINE, an individual, et al.<br><br>Counter-Claimants.<br><br>vs.<br><br>VIVERA PHARMACEUTICALS, INC., a Delaware corporation, PAUL EDALAT, an individual, and OLIVIA KARPINSKI, an individual, VERAGO, LLC, a California limited liability company; FARAH BARGHI, an individual, and SAFE CHAIN SOLUTIONS, LLC.<br><br>Counterclaim-Defendants, | **Case No. 2:20-CV-02160-GW (MAAx)**<br><br>Hon. George H. Wu<br><br>**DEFENDANTS BLAINE LABORATORIES, INC. AND DR. ROBERT BLAINE'S FIRST AMENDED COUNTERCLAIM AGAINST PLAINTIFF VIVERA PHARMACEUTICALS, INC. AND AGAINST ADDITIONAL DEFENDANTS ON THE COUNTERCLAIM PAUL EDALAT, OLIVIA KARPINSKI, VERAGO, LLC, FARAH BARGHI, and SAFE CHAIN SOLUTIONS, LLC**<br><br>**A JURY TRIAL DEMANDED ON ALL ISSUES SO TRIABLE**<br><br>Complaint Filed:  February 19, 2019 |

Counter-Claimants DR. ROBERT C. BLAINE ("Dr. Blaine") and BLAINE LABORATORIES, INC., a California corporation ("Blaine Labs"), allege as follows against Plaintiff and Counterclaim Defendant VIVERA PHARMACEUTICALS, INC. ("Vivera"), a Delaware corporation; and against additional Counterclaim Defendants on this Counterclaim PAUL P. EDALAT ("Edalat"), an individual; OLIVIA KARPINSKI ("Karpinski"), an individual; VERAGO, LLC, a California limited liability company ("Verago"); FARAH BARGHI ("Barghi"), an individual, and SAFE CHAIN SOLUTIONS, LLC, ("SafeChain"), a Maryland Limited Liability Company.

### THE PARTIES

1.     Dr. Blaine is, and at all times relevant hereto was, an individual residing in the State of California. He is a physician licensed by the state of California, a scientist, an inventor, and the President of Blaine Labs, among other activities.

2.     Blaine Laboratories, Inc. ("Blaine Labs") is, and at all times relevant hereto was, a California corporation with its principal place of business in Santa Fe Springs, California. Blaine Labs is a pharmaceutical company.

3.     Counterclaim Defendant Paul Edalat ("Edalat") is, and at all times relevant hereto was, an individual residing in the State of California. Edalat is a resident of Orange County, California. Edalat is the Chairman of the Board and a director of Vivera Pharmaceuticals, Inc. and is its principal.

4.     Counterclaim Defendant Vivera Pharmaceuticals, Inc. ("Vivera") is a Delaware corporation authorized to do business in the State of California. Vivera was incorporated

in Delaware in April 2018 and became authorized to do business in California in May 2018. Vivera's principal place of business is in Orange County, California. Vivera is controlled by Edalat; and it acts as Edalat tells it to act and exists and acts solely as Edalat's *alter ego*, doing only what he commands to further Edalat's fraudulent activities. It is a mere shell and does not observe any of the corporate formalities. Vivera is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct of Edalat; it is legally therefore one and the same with Paul Edalat; and its actions are the actions of Edalat and Edalat's actions are its actions. It is liable for all the actions done by Edalat because it is his *alter ego*. Edalat is also its agent and the actions alleged in this Amended Counterclaim undertaken by Edalat bind Vivera under the principal and agent and *respondeat superior* doctrines as well as under the *alter ego* doctrine.

5.    Counterclaim Defendant Olivia Karpinski ("Karpinski") is, and at all times relevant hereto was, an individual residing in the State of California. Karpinski is a resident of Orange County, California. Karpinski is a Co-Founder and Director of Vivera and in relation to Vivera, she does what Edalat tells her to do. Karpinski is also listed on Vivera's website as the Vice President of Sales and Marketing. Karpinski is also the incorporator of Verago, LLC, and Dr. Blaine and Blaine Labs believe, and on that basis allege, that Karpinski is the sole member of Verago, LLC.

6.    Counterclaim Defendant Verago, LLC, is a Delaware limited liability Company authorized to do business in the State of California. Verago was incorporated in

Delaware in July 2018 and became authorized to do business in California in November 2020. Verago's principal place of business is in Irvine, California. Verago is controlled by Karpinski; it has no separate existence apart from Karpinski, and instead it acts as Karpinski tells it to act and exists and acts solely as Karpinski *alter ego*, doing only what she commands to further Karpinski's fraudulent activities. It is a mere shell and does not observe any of the corporate formalities. Verago is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct of Karpinski; it is legally therefore one and the same with Karpinski; and its actions are the actions of Karpinski, and her actions are its actions. It is liable for all the actions done by Karpinski because it is his *alter ego*. Karpinski is also its agent and the actions alleged in this Amended Counterclaim, undertaken by her bind Verago under the principal and agent and *respondeat superior* doctrines as well as under the *alter ego* doctrine.

7.     Counterclaim Defendant Farah Barghi is, and at all times relevant hereto was, an individual residing in the State of California. Barghi is a resident of Orange County, California. Farah Barghi is/was a director of Vivera, a Vivera employee, and she is Edalat's sister and she does what he tells her to do.

8.     Safe Chain Solutions, LLC ("SafeChain") is a limited liability company organized under the laws of the state of Delaware and Headquartered at 822 Chesapeake Drive, Cambridge, Maryland. SafeChain advertises itself as a full-service, wholesale pharmaceutical distributor, providing a wide range of pharmaceuticals and health care

products nationwide, and it distributes its products within this District.

9.     Each Counterclaim Defendant, except SafeChain, named above was the agent, ostensible agent, co-conspirator, servant, employee, partner, joint ventures, franchisee, and/or alter ego of each of the other Counterclaim Defendants and was acting within the purpose and scope of such conspiracy, service, agency, employment, partnership, joint venture, and/or franchise. All actions of each Counterclaim Defendant were ratified and approved of by each of the other Counterclaim Defendants.

10.     As more specifically alleged below, each of these Counterclaim Defendants, except SafeChain, which is charged only in Count Seven which is not a RICO, Count is part of a criminal enterprise within the meaning of the Racketeer Influenced and Corrupt Organization Act, (title 18 U.S.C. section 1961(4)) (hereinafter "RICO") and these Counterclaim Defendants conducted and participated in a RICO enterprise in violation of 18 U.S.C. section 1962(c) and conspired with each other and others in violation of  8 U.S.C. section 1962(d) to injure the business and property of Dr. Blaine and Blaine Labs though a pattern of predicate criminal acts perpetrated by them and the enterprise they have formed, all as described below.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this case because the RICO claims stated in Counts I through II arise under the laws of the United States, specifically 18 U.S.C. §1961 *et seq*., the patent infringement claim stated in Count III arises under 35 U.S.C. § 284; the trademark infringement, in Counts 4 through 7 arise under the Lanham

1  Act, Title 15 U.S.C. §1125, *et seq.* and thus there is federal question jurisdiction pursuant

2  to 28 USC §1331.

3       12.   Personal jurisdiction and Venue are proper because this District is where a

4  substantial part of the conduct described below occurred, where the property at issue is

5  located, and where the Counter Defendants reside and do business. They are thus subject

6  to personal jurisdiction within this District and this District is also the proper venue under

7  28 U.S.C. section 1391.

8

9                         **FACTUAL BACKGROUND**

10      **A.  Edalat, Karpinski and Barghi and their False Pretenses**

11      13.   Counterclaim Defendant Paul Edalat ("Edalat") is a fraud who has for many

12  years engaged in various schemes and artifices to defraud others and to obtain their money

13  by false and fraudulent pretenses. Edalat's fraudulent activity has now for at least the last

14  five years been joined in by Karpinski and Barghi. The three of them, using a series of

15  different entities as part of their fraud and to further it, including counterclaim Defendants

16  Vivera and Virago, defrauded many individuals and entities.

17      14. Edalat, Karpinski and Barghi use the appearance of wealth to convey the

18  impression that Edalat is a successful and wealthy businessperson. They arrive at meetings

19  with those whom they are lulling into a fraudulent scheme, *i.e.*, their targets for fraud, in

20  either a Rolls Royce, a Lamborghini, a Land Rover, a Ferrari or another high-end vehicle.

21      15. Edalat represents to his targets for fraud that he is the owner of a residence at

22  the prestigious Resort at Pelican Hill in Newport Beach, California.

16. He wears the finest clothes and brags to his targets of fraud about large and successful business deals and tells them that that he is staying in luxury suites. He appears at these meetings wearing a diamond-studded gold Rolex watch that he brags he purchased for more than $50,000.00 and organizes extravagantly fancy dinners and weekend retreats for those who he is lulling into a fraudulent scheme.

17. He pretends that he owns and had access to private jets because of his wealth. He presents photographs of the jets to which he claims access because of his wealth. This lifestyle presentation is used by Edalat in order to create the false illusion with those he is intending to defraud, including Blaine and Blaine Labs, that he has acquired his money by successfully managing profitable ventures so that they will be duped into trusting him and entering into business relations with them so that he can thereafter defraud them by taking their money and property.

18. Edalat is joined in these meetings with targets for fraud by Karpinski and Barghi.

19. Despite the successful image created by the trappings of wealth Edalat, Karpinski and Barghi display, Edalat is and always has been in fact a financial failure at all the business he has undertaken, except for his fraudulent schemes whereby he obtains the money of others by false and fraudulent pretexts.

20. While parading his lavish lifestyle, he conceals from his targets for fraud, including the Blaine and Blaine Labs, that he is a commercial failure who has filed for personal bankruptcy three times in the last 20 years. Those filings were *In Re Paul Edalat*,

97-bk-30199-LR; *In Re Paul Edalat*, 05-bk-13868-JB; and *In re Paul Edalat*, 14-bk-14529-TA.  He also has had many liens and judgments filed in Orange County against his affiliated companies for failing to pay state and federal taxes; he has also had civil judgments against him; and was in fact in personal bankruptcy when he was meeting with Blaine and Blaine Labs when he was lulling them into believing that he, Edalat, was a successful businessperson wealthy from his success, as detailed further below.

21.    Edalat had also been sued in federal court in Los Angeles by the Food & Drug Administration (the "FDA") in the case entitled *United States of America v. Scilabs Nutraceuticals, Inc.,* 8:14-cv-01759-JLS-AN, for his repeated failure to comply with the FDA warnings to him about his and his company's failures to follow FDA safety rules and his and his company's repeated sale of adulterated food products.  The federal judge sitting on the case issued a permanent injunction against Edalat and his company, ordering them not to manufacture or in any way be involved, directly or indirectly, with the manufacture, possession, or distribution of dietary supplements or food products.

22.    Edalat fails to disclose to his targets for fraud that he has been banned by the FDA and indeed brags of his expertise and prowess in dealing with the FDA.

23.    In bankruptcy, Edalat knowingly has filed incomplete schedules of his assets, hiding them from the bankruptcy trustee and thus from his creditors. While thus acting in the bankruptcy court in this fraudulent manner, he continues to pretend to those who he intends to defraud that he is very successful and thus fully capable of supporting his luxurious lifestyle by the earnings from his business successes.

24.   Edalat, with the complicity of Barghi and Karpinski, has been defrauding honest and trusting business people and their companies for many years. He has been sued repeatedly for his failure to pay money he owes, or that his companies owe, to honest and trusting people, including the following lawsuits to which he has admitted when cornered about them but which he fails to disclose to those he is in the process of defrauding:

a.   *Fact Products, Inc. v. Scilabs Neutriceuticals, Inc. and Paul Edalat*, Case No. 30-20130664485 (Orange County Superior Court) (customer made deposit and did not receive product or refund);

b.   *Europa Sports Products, Inc. v. Scilabs Neutriceuticals, Inc*., Case No. 30-2012-617980 (Orange County Superior Court) (vendor was not paid for goods);

c.   *Charter Adjustment s Corporation v. Scilabs Neutraceuticals, Inc.*, Case No. 30-2012-558555 (Orange County Superior Court) (vendor was not paid for goods);

d.   *Berlin Packaging LLC v. Scilabs Neutraceuticals, Inc.*, Case No. 30-2014-0704533 (Orange County Superior Court (vendor was not paid for goods);

e.   *Affinity Flavors, Inc. v. Scilabs Nutraceuticals, Inc.*, Case No. 30-2012-616468 (Orange County Superior Court) (vendor was not paid for goods);

f.   *Wisdom Proteins, Inc. v. Scilabs Neutraceuticals*, Case No. 30-20110517461 (Orange County Superior Court) (vendor was not paid for goods);

g.   *Total Sweeteners, Inc. v. Scilabs Neutraceuticals, Inc.*, Case No. 30-2011-511709 (Orange County Superior Court) (vendor was not paid for goods);

h.   *Tri-Pack Enterprises Inc. v. Scilabs Neutraceutical,* Case No. 30-2011-470480 (Orange County Superior Court) (vendor was not paid for goods);

i.   *TLC The Label Company CA Inc. v. Scilabs Neutraceuticals, Inc.*, Case No. 30-2013-621808 (Orange County Superior Court) (vendor was not paid for goods);

j.   *Gen X Health Products, Inc. v. Scilabs Neutraceutical Manufacturing*, Case No. 30-2011-439131 (Orange County Superior Court) (vendor as not paid for goods);

k.   *Fuller Enterprises USA, Inc. v. Scilabs Neutraceuticals, Inc.,* Case No. 30-2012-6033741 (Orange County Superior Court) (vendor was not paid for goods);

l.   *Younesi & Yoss LLP v. Paul Edalat & Scilabs Neutraceuticals, Inc.* Case No. 30-2010-415338 (Orange County Superior Court) (former attorneys not paid);

m.   *American Commercial Equities Three, LLC v. Scilabs Nutraceuticals, Inc.*, Case No. 30-2013-638603 (Orange County Superior Court) (unlawful detainer action);

n.   *Olen Commercial Realty Corp. v. Veripak Corporation and Paul Edalat* Case No. 30-2013-635948 (Orange County Superior Court) (breach of commercial lease by Veripak and breach of personal guarantee by Edalat);

o.   *Biocaps Enterprise, Inc. v. Veripak Corporation,* Case No. 30-2008-85523 (Orange County Superior Court) (unpaid vendor);

p.   *Price, Meese, Shulman & D'Armino, PC v. Veripak, Inc.*, Docket No. DC-8388-07 (Bergen County, New Jersey) (default judgment by former attorneys);

q.   *Max International v. Veripak Corporation*, Case No. 30-2008-106802 (Orange County Superior Court) (conversion action by supplier);

r.   *JC Bright v. Veripak Corporation*, Case No. 30-2008-108909 (Orange County Superior Court) (vendor was not paid);

s.   *Lincoln Financial Media Company of Georgia v. All Pro Science,* Case No. 30-2012-578313 (Orange County Superior Court) (unpaid vendor);

t.   *FedEx Techconnect, Inc. v. All Pro Science, Inc.,* Case No. 30-2012-59536 (Orange County Superior Court) (unpaid vendor); and

u.   *OC-Shirt Inc. v. SITG Corporation and Paul Edalat*, Case No. 30-2010-339785 (Orange County Superior Court) (collections and fraudulent transfer action); and,

9

BLAINE PARTIES' FIRST AMENDED COUNTERCLAIM

v.   In addition to the above suits, two prior landlords have sued Edalat's companies for nonpayment of rent. *American Commercial Equities Three, LLC v. Scilabs Nutraceuticals, Inc.*, Case No. 30-2013-638603 (Orange County Superior Court) (unlawful detainer action); *Olen Commercial Realty Corp. v. Veripak Corporation and Paul Edalat* Case No. 30-2013-635948 (Orange County Superior Court) (breach of commercial lease by Veripak and breach of personal guarantee by Edalat).

**B.   Edalat's Aliases Used to Cover Up His Past Failings**

25.   Over the prior ten years, Edalat has employed a series of aliases and variant spellings of his name, including Paul Pejman Edalat, Paul P. Edalat, Paul P. Adalat, Paul Edelat, Paul Edalttat, Paul Edlat, Paul P. Barghi, and Paul Benjamin Edalat. In this action he is referred to as Edalat, because that is the most frequent of then names he uses when perpetrating his frauds against other people.

**C.   Concealment of these Commercial Frauds and Failings**

26.   Edalat, Karpinski and Barghi have defrauded many people, including Blaine and Blaine Labs, by failing to disclose all of the above-described commercial failures while pretending to be successful business people which they are not as they well know. They have engaged in this concealment so as to induce many people, including Blaine, Blaine Labs and others, to trust them and to believe that they were in fact successful business people when in truth and fact they are frauds and they defraud person after person in the same manner.

27.  They do not pay their debts, judgments or liens. They are scofflaws who prey on innocent people.

**D. The RICO Enterprise**

28.  Commencing at least as early as 2015 and continuing to and including the date of this Amended Counterclaim, Edalat, Karpinski and Barghi have formed and operated a criminal enterprise. They have, while acting in and affecting interstate commerce, conspired to form and did form an illegal enterprise within the meaning of 18 U.S.C.§1961(4). They are now using both Verago and Vivera as entities which have joined the enterprise to help in their enterprise and to effectuate its purposes, which are to defraud individuals and entities by scheming to defraud. Edalat, Karpinski, Barghi, Vivera and Verago are hereinafter sometimes referred to as the "Edalat Enterprise."

29.  This Edalat Enterprise members have associated together for the common purpose of engaging in a course of conduct to defraud people and entities in the manner described below.

30.  By using a series of false representations and promises in order to defraud persons of the money or property and using interstate wire communications to further this fraud, in violation of the federal wire fraud statute, 18 U.S.C. section 1343, they have engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. section 1961(1) and, in the manner set forth further below the Edalat Enterprise has injured Blaine and Blaine Labs in their business and property within the meaning of 18 U.S.C. section 1964, all as described further below.

31.     In addition to wire fraud, the Edalat enterprise has engaged in other RICO predicate Acts, including theft of trade secrets and economic espionage in violation of 18 U.S.C. section 1832; money laundering in violation of 18 U.S.C. sections 1956 and 1957; trafficking in goods bearing counterfeit trademarks in violation of 18 US.S.C. section 2320, interstate transportation of stolen property in violation of 18 U.S.C. sections 2314 and 2315, and bankruptcy fraud in violation of 18 U.S.C. section 157, all as detailed further below.

32.   The Edalat Enterprise has used a series of entities to further their racketeering activity.

33.   The Edalat Enterprise has used LIWA, N.A., Inc. ("LIWA"), a Wyoming limited liability company formed under the laws of the state of Wyoming. LIWA has a bank account used by Edalat to launder fraudulently obtained monies.

34.   The Edalat Enterprise has also caused persons who paid him money for stock and other matters to make their checks and deposits payable to LIWA, doing since as early as 2015 when he was in bankruptcy and doing so as a means of hiding from the bankruptcy court and trustee that he owned assets and had access to cash causing such payments and deposits to go into LIWA's account instead of his own bank account. Edalat did so at a time when he was being questioned under oath in the bankruptcy proceeding about what stock he owned in what companies. LIWA was used to hide this crime of bankruptcy fraud and was and continues to be used as a conduit to launder money by disguising its source or origin in violation of 18 U.S.C. section 1957.

BLAINE PARTIES' FIRST AMENDED COUNTERCLAIM

35.   The LIWA bank account is used to transfer money between Edalat and a lady friend, named Nicole Fletcher, as a way of disguising the fact that the money is actually income by pretending that it is loans between the two of them when in fact it is not.

36.   LIWA is controlled by Edalat and by Barghi who act with and for LIWA under the control and direction of the Edalat Enterprise. LIWA has no separate existence apart from Edalat and Barghi, and instead it acts as Edalat and Barghi tell it to act and exists and acts solely as Edalat's *alter ego*, doing only what he commands either directly or through Barghi to further Edalat Enterprises 's pattern of racketeering activities. It is a mere shell and does not observe any of the corporate formalities. LIWA is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct of the Edalat Enterprise.

37.   Another entity used by the Edalat Enterprise is EFT Global Holdings, Inc. ("Global Holdings"), a Nevada corporation formed on July 2, 2013, and which has its principal place of business in Las Vegas, Nevada. It has operated since its inception through two fictitious names, at separate times. Since early 2015, Global Holdings has used the fictitious d/b/a "Sentar Pharmaceuticals." Before Sentar Pharmaceuticals became the d/b/a for Global Holdings, Global Holdings' d/b/a was "Scilabs Pharmaceuticals." Edalat and Barghi changed the d/b/a from Scilabs Pharmaceuticals to Sentar Pharmaceuticals because another Edalat owned-owned entity, Scilabs Nutraceuticals, Inc., was shut down in late November, 2014 by a federal court order obtained by the United States Food and Drug Administration (the "FDA").

38.   The Court shut down Scilabs Nutraceuticals, Inc. upon a showing by the FDA that Scilabs Nutraceuticals, Inc. and Edalat had repeatedly violated the health and safety standards required by United States law (the Food Drug and Cosmetic Act) in connection with Edalat's manufacturing of nutraceutical products under the name Scilabs Nutraceuticals, Inc.

39.   Because of the bad publicity associated with the court-ordered shutdown of Scilabs Nutraceuticals, Inc., and the close name similarity between the shut-down Scilabs Nutraceuticals, Inc. and the d/b/a Scilabs Pharmaceuticals which Global Holdings was then using, Edalat and Barghi changed Global Holdings d/b/a Scilabs Pharmaceuticals to Global Holdings d/b/a Sentar Pharmaceuticals so that those who Edalat, Karpinski and Barghi were trying to defraud by showing them how successful he was with FDA regulated products, would not be deterred from believing in that success because of the FDA and court ordered shutdown of Scilabs Nutraceuticals, Inc. This d/b/a name change was done knowingly by Barghi and Edalat in order to conceal from investors that Edalat's other company, Scilabs Nutraceuticals, Inc., was sued and enjoined by the FDA and the federal court.

40.   On April 22, 2015 and thereafter, Edalat and Barghi schemed in interstate commerce to change the name on certain documents from "dba Scilabs" to "dba Sentar" in order to conceal from those they were scheming to defraud that the Edalat Enterprise was associated with a disgraced and FDA-banned company. Specifically, on that date Edalat emailed Barghi by a wire communication sent in interstate commerce as follows: "I told

you guys to fix them and make sure I don't have them under Scilabs," in order to conceal from those being lulled into fraud that they had been banned by the FDA and a federal court injunction.

41.   Since 2018, the Edalat Enterprise has used Vivera as an entity to further its fraud. Since Vivera was formed in 2018, it has made the following fraudulent representations, among others, in concert and combination with Edalat, Karpinski and Barghi, by wire communications in interstate commerce for the purposes of furthering the pattern of predicate acts of fraud and racketeering to injure others in their business and property -- when the term "wire communications" is used in this Amended Counterclaim, it means and includes any communication by wire, radio, or television as those terms are used in 18 U.S.C. section 1343 and/or by email, internet or other electronic communication in interstate commerce:

(a) Vivera, along with Barghi, Edalat, and Karpinski, have falsely stated publicly that Vivera is the exclusive worldwide licensee of certain globally patented rights to distribute certain patented technology for the rapid sublingual delivery and absorption of cannabinoids including CBD and THC. These representations were made even though all members of the Edalat Enterprise well knew and know that in 2017 Edalat, through his company EFT Global Holdings dba Sentar Pharmaceuticals conveyed to another company the exclusive worldwide distribution rights of that same technology and therefore Vivera has no such rights. These false statements have been continuously communicated in

interstate commerce in internet postings made by the Edalat Enterprise by wire communications sent under the name Vivera Pharmaceuticals from 2018 through the present time and these communications have been sent from Orange County California within this District;

(b) For example, in or around June 2018, the Edalat Enterprise produced and distributed in interstate commerce by wire communication a Vivera Pharmaceuticals Brochure annexed as Exhibit A to this Amended Counterclaim stating falsely that:

Vivera Pharmaceuticals holds the exclusive license for the patented, sublingual TABMELT delivery system for use with Cannabinoids, terpenes and cannabis plant and biosynthetic compounds (CBD, THC, CBG, CBN, terpenes, etc.);

And:

Utilizing its exclusive, global license to the patented TABMELT sublingual drug delivery system for the pharmaceutical use of Cannabinoids, Vivera Pharmaceuticals . . . is primarily focused on the research and development of finished cannabinoid pharmaceutical products . . .;

And:

Vivera seeks to sublicense the TABMELT technologies a drug delivery system;

And:

Vivera is "an IP Holding Company."

(c) The above-referenced statements about Vivera's exclusive ownership of the above-referenced technology rights were knowingly false when made because, as stated above, as of January 16, 2017, another company controlled by Edalat, named EFT Global Holdings dba Sentar Pharmaceuticals, along with Edalat

himself, had conveyed the exclusive rights to some of that sublingual technology to another company and there was no possible way for Vivera to have been conveyed those same rights, as all members of the Edalat Enterprise well knew.

(d) Moreover, the above-referenced assertion that these "rights" were patented or "patented globally" were false because, as all members of the Edalat Enterprise well knew, no patents protected this sublingual process.

(e) As of as recently as August 17, 2021, Vivera, in combination with Edalat, Karpinski and Barghi, posted a wire communication in interstate commerce stating falsely as follows:

> Vivera Pharmaceuticals is an innovative, science-driven pharmaceutical company located in Southern California. The Company has global exclusivity to license the patented and patent-pending TABMELT® sublingual drug delivery system for pharmaceutical use . . .

(f) The Edalat Enterprise has used these false assertions to defraud individuals and entities, including Dr. Blaine and Blaine Labs, as explained further below.

(g) Vivera, along with Barghi, Edalat, and Karpinski, have falsely stated publicly that Vivera will go public when in fact it knows it cannot do so;

(h) Vivera, along with Barghi, Edalat, and Karpinski, acting as the Edalat Enterprise, have sold "tests" which they falsely stated to be "FDA approved tests" to detect the Covid-19 virus when they well knew that no such approval has been made by the FDA and in fact their "test" had been discredited by the FDA and specifically determined to be not approved; moreover Vivera communicated its falsely claimed FDA approval in interstate commerce by wire

communications commencing March, 2021 through the present time, doing so continuously from Orange County within this District;

(i) As part of their false claim to have produced a rapid Covid 19 test these Edalat Enterprise members posted on the internet in interstate commerce a wire communication stating that Vivera had developed such a test. Said wire communication, posted continuously from in or around March 2020 through at least June, 2021, depicted a photograph of a box, bearing the name Vivera, and an FDA certification number, and indicating that the box contained a Rapid Covid test. The FDA number does not exist in the records of the FDA, said test was not approved by the FDA and this depiction was a fraud in an attempt to sell additional such fraudulent tests;

(j) These false statements made about their so-called rapid tests for Covid-19 show just how criminal this Enterprise is; its members, for profit, are willing to deceive and have deceived members of the public into relying on a fake test for a deadly and fast-spreading, highly contagious disease where their deceit runs the substantial risk of falsely lulling innocent takers of its fake test into believing that the have tested negatively for Covid and thus forego seeking proper medical care and spreading this highly contagious disease throughout the community, causing illness and risking death;

(k) The FDA banned the Edalat Enterprise fake Covid test and so notified Vivera and through it the other Edalat Enterprise members;

(l) Despite this, the Edalat Enterprise fraud in connection with its fake and dangerous test continues and an ongoing part of the pattern fraud by wire because even after being banned, and in order to continue selling their fake Covid test, the Edalat Enterprise merged Vivera (which had been banned from such sales) with Ome Care so that it could continue such unlawful and highly dangerous sales of its fake and on August 10, 2021 the FDA again banned any such sales again for Vivera and also for Ome Care; and

(m) By an announcement posted from San Diego, California and communicated by interstate wire communication in interstate commerce, these Edalat Enterprise members made the fallowing false knowing statements which continue to be wire communications in interstate commerce by way of announcing a "diagnostic Laboratory" venture between Vivera and Dalrada Health, all of which statements are knowingly false:

> Vivera brings to the Pala Diagnostics joint venture its current operations including its extensive network of health care providers and end customers across multiple industries. Vivera is vertically integrated with technology and distribution for its pharmaceutical, medical device, advanced diagnostics, and medical technologies products. Vivera has global exclusivity to license the patented and patent-pending TABMELT® sublingual drug-delivery system for the pharmaceutical use of therapeutic compounds.

> Paul Edalat, Chairman and CEO of Vivera states, "This joint venture between Dalrada Health and Vivera expands operational capabilities for Pala Diagnostics. Vivera has, since the beginning of the pandemic, sought to bring the best of COVID-19 testing to patients and providers. As schools and businesses begin to reopen on a full-time basis, we look forward to providing testing services to ensure safer communities."

Through the above-referenced and other false statements made by Edalat, Karpinski, and Barghi, through Vivera, all acting as the Edalat Enterprise, they have engaged in a pattern of making interstate wire communications which form much of the predicate criminal conduct of their racketeering activity, wire fraud, and a substantial part of that racketeering activity, namely representing themselves to be knowledgeable and successful business persons who have made Vivera a highly desirable company with which to do business; and because of these false statements, along with their false portrayal of themselves as wealthy from their successes when they were not; and by these false statements and their concealment of their bankruptcies, the FDA injunction, and the many commercial failures, judgments, suits against them and liens, they have fraudulently induced Dr. Blaine and Blaine Labs to join with them commercially in a way that has caused substantial injury to the business and property of Dr. Blaine and Blaine Labs as we show further below after describing the highly valuable business that Dr. Blaine made of Blaine Labs before the Edalat Enterprise caused and continued injury to it.

### E.    Dr. Blaine, Blaine Labs, and their Products

42.   Dr. Blaine is a respected, hardworking scientist and podiatric doctor and surgeon. He who overcame great hardship to build Blaine Labs into a successful nationwide business.

43.   Born in 1958 in Phoenix, Arizona to a geneticist and a psychiatric social worker, Dr. Blaine moved first to California and then to Iowa by the age of two and a half.

BLAINE PARTIES' FIRST AMENDED COUNTERCLAIM

Dr. Blaine was a successful high school athlete and an excellent student. He graduated in 1976 and began attending Drake University.

44.   Dr. Blaine graduated from Cal State Bakersfield in 1980, magna cum laude, with a double major in biology and chemistry and a minor in psychology. He thereafter attended the University of California Riverside for one year in a biochemistry master's program before being accepted in 1981 at the California College of Podiatric Medicine. He graduated with his doctorate in podiatric medicine in 1985 and began a podiatric surgical residence at Sacramento Community Hospital, where he stayed until 1986. From 1986 to 1987, he did his fellowship at the UCLA Department of Medicine in peripheral vascular disease.

45.   Around the same time, Dr. Blaine was offered the opportunity to take over the podiatric practice of a doctor in Norwalk, California, an opportunity he enthusiastically accepted. Over the next ten years, he invested in and grew the practice to include two additional offices in Cerritos and Bellflower.

46.   In 1998, he joined the Southern California Orthopedics/Sports Medicine Center as a podiatric trauma surgeon. He eventually joined the practice full time and remains on staff.

47.   Dr. Blaine is a member of the Orange County, California, and American Podiatric Medicine Societies. He is a board-certified foot and ankle surgeon, a qualified industrial medical examiner, and an x-ray/fluoroscopy supervisor. He acted as a podiatric

advisor to members of the Los Angeles Raiders and was the team podiatrist for the Cal State Dominguez Hills basketball team.

48.     Dr. Blaine holds twenty-one patents and trademarks, including for medical devices, topical medications, and salon products.

49.     Following his father's passing from diabetes and inspired thereby to ensure no one else never needed to suffer the way his father had (foot complication from diabetes), Dr. Blaine came up with an idea that launched Blaine Labs. This idea was a product he called TINEACIDE, Blaine Labs' first product.

50.     TINEACIDE is an anti-fungal cream which can be applied directly to the affected areas of the foot. Previous treatments for fungal toenails required patients to take oral medication which, after prolonged use, could cause liver toxicity. TINEACIDE is an FDA cleared product to treat the skin fungus that caused fungal toenails without causing a different harm to the body.

51.     TINEACIDE began production in 1996 and was an immediate success. Blaine Labs grew quickly, especially after the launch of its second key product, Revitaderm, a skincare product intended for diabetics with extremely dry skin. Today, these products form the basis for numerous product lines and have enjoyed national distribution by major pharmacies like Walmart, Walgreens, CVS, and Rite Aid.

52.     When it began in 1996, Blaine Labs operated out of a single treatment room in a clinic. Within a year, it took over two more rooms in the same clinic. The next year, it

moved to a 1500 square foot facility and then added two adjoining spaces totaling 3500 square feet.

53.    In 2004, Blaine Labs moved to its current business location, the first of three parcels of adjoining real property currently owned by Blaine Holding in Santa Fe Springs, California. Blaine Labs has continuously owned and occupied this building since 2004. In 2012, Blaine Holding purchased the remainder of what comprises Blaine Labs' three-building campus.

54.    Today, Blaine Labs is a company with nationwide distribution, numerous product lines, and four divisions – direct-to-physician, beauty, retail, and RX. Blaine Labs enjoys the benefits of Dr. Blaine's expertise and hard work and his skill, foresight and industry, because it has both research and development and manufacturing abilities. In the midst of the COVID-19 health crisis, Blaine Labs has shifted its priority to producing as much medical-grade hand sanitizer as possible.

55.    All of Blaine Labs' products and success were built on Dr. Blaine's dreams to find ways to help people in the wake of his father's death. Doctors, pharmacists, consumers, and retailers have all recognized the value of that dream. Dr. Blaine's passion, talent, and hard work have ensured that Blaine Labs' products are household names.

**F.    Blaine Labs' Patent for Scar Treatment Using Silicone Gel Pads and Sil-K**

56.    Among other valuable products created and distributed by the skill and industry of Dr. Blaine and Blaine Labs, they developed a silicone gel sheet for reducing scars. On

September 7, 2000, Blaine Labs filed an application with the USPTO to patent an improved silicone gel sheet and method for reducing scars. The patent was issued on June 3, 2003. (US Patent Number 6,572,878). Blaine Labs held the patent for its entire lifetime of twenty years until it expired on or around October 9, 2020.

57.    Blaine Labs used its patented technology to develop gel scar care pads branded "Sil-K". These gel scar care pads by "private label" versions that are registered with insurance companies and pharmacy benefit management databases can have higher reimbursement rates. During the relevant time period, Sil-K "private label" was being reimbursed by insurance companies at a rate of $1900-$4500 per box containing 4 pads each.

58.    On or about December 14, 2017 (long before entering any agreement with Vivera), Blaine Labs entered into a distribution agreement with Solutech Pharmaceutical LLC ("Solutech"), in which Blaine Labs would manufacture its "gel matrix" scar care pads for Solutech to use in a private label product named Sil-K.

59.    Sil-K is "private label" (brand name) for a gel scar treatment pad and uses both Blaine Labs' FDA 510(k) number (No. K001608), a number given by the FDA upon certain minimum approvals by the FDA for certain types of products and their substantial equivalents; and Blaine Labs' "Medical Grade Silicone Gel Matrix" (described in US Patent Number 6,572,878), which the Sil-K product uses as its active ingredient.

60.    Both Blaine Labs' 510(k) number and Blaine Labs' patent have independent value and the former is necessary to receive the higher reimbursement value from

insurance companies paying for claims submitted to them for purchase and use of Sil-K. Both the Blaine Labs 510(k) number and its patented technology existed prior to Vivera's fraud against Dr. Blaine and Blaine Labs and were the sole property of Blaine Labs.

61.     As part of the Solutech distribution agreement, Blaine Labs was to have 20,000 scar pads on hand at all times. The Blaine Labs/Solutech relationship was fruitful in the beginning, until Solutech ceased communicating with Blaine Labs, stopped making new orders, and failed to pay for completed orders.

62.     In or around May of 2018, Solutech informed Blaine Labs that everything was "on hold" and that "they were done." Solutech stopped placing orders and refused to pay outstanding invoices for orders already completed Further, on information and belief, Solutech stopped selling Sil-K and therefore abandoned any rights it had the trademark.

63.     At the time Solutech abandoned Sil-K, Blaine Labs had approximately 80,000 individual pads of Sil-K and 2,800 completed kits (four pads each) on hand that were unpaid for by Solutech.

64.     Although Solutech stopped selling Sil-K completely, the demand for Sil-K was at an all-time high due to high insurance reimbursement rates. Solutech's abandonment of Sil-K left wholesalers scrambling to find another source of Sil-K, and concurrently left Blaine Labs with tens of thousands of already manufactured scar care pads, which Solutech had not paid for. As a result, on or around June 4, 2018, Blaine Labs terminated the Solutech distribution agreement with said termination effective on August 4, 2021.

65.     Therefore, as of August 2018 (months before entering an agreement with

Vivera) former customers of Solutech reached out to Blaine Labs directly.  On June 29, 2018, Ken Ritchie and Brandon Reich of Gulf Coast Pharmaceuticals ("Gulf Coast") flew to California to meet with Dr. Blaine and Blaine Labs to discuss how to continue manufacturing/selling Sil-K.

66.    Sometime between the Gulf Coast meeting referred to in para 65 above and the execution of the Share Exchange Agreement, Edalat and Blaine began discussing Blaine Labs entering into a distribution agreement with Vivera, wherein Vivera would act as a distributer of Sil-K. On or around late August to early September 2018, Vivera and Blaine Labs entered into an oral distribution agreement wherein Vivera would act as a distributer for Blaine Labs' Sil-K and Vivera and Dr. Blaine would split the profits 50/50.

67.    On September 24, 2018, Gulf Coast purchased from Blaine Labs $950,000 worth of Sil-K scar pads.

68.    On September 25 and 26, 2018, Primary Pharmaceuticals purchased $1,425,000 worth of Sil-K scar pads. Therefore, prior to having executed any agreement with Vivera, Blaine Labs was paid $2,375,000 for the sale of its property.

69.    From the marketing of this successful product, Sil-K, and others, as of October 2018, Blaine Labs was a successful profitable company.

### G.    The Edalat Enterprise Defrauds Dr. Blaine and Blaine Labs.

70.    In October 2017, Dr. Blaine and Edalat were introduced by former NFL player Ron Brown. Edalat, following his usual fraudulent method of operation as he has perpetrated on other fraud victims, portrayed himself as a twenty-five-year highly

successful veteran of the pharmaceutical industry, with special knowledge of how to deal with the regulatory hurdles of the FDA and the Food Drug and Cosmetic Act. He impressed Dr. Blaine with stories of a string of financial successes, millions of dollars in the bank, and fancy cars in one of his warehouses. Edalat told Dr. Blaine stories about having managed multiple pharmaceutical companies, that he previously had been the exclusive distributor for the Nature Made brand of products, and that he had various global patents and licenses. He claimed to have over 200 employees throughout California manufacturing private-label products for large corporations that were sold by major retailers nationwide. He bragged about partnerships with famous athletes and overseas investors.

71.   All of these assertions were false and all were made by Edalat in or around the summer and fall of 2018 in or around either Blaine Labs facility in Santa Fe California or in various restaurants or meeting rooms within this district.

72.   At that time, in the fall of 2017 when Dr. Blaine and Edalat were first introduced, Vivera did not yet exist but Edalat and the other members of the Edalat Enterprise explained to Dr. Blaine that it was already formed and was already using his patented technology, TABMELT.

73.   In fact, Vivera was incorporated, later, in April 2018 some five months into the scheme to defraud Dr. Blaine.  Counter-Claimants are informed and believe that Vivera was formed with the specific intent and purpose to serve as a vehicle to defraud Blaine and others, thereby becoming part of the Edalat Enterprise.

BLAINE PARTIES' FIRST AMENDED COUNTERCLAIM

74.    Initially, in 2017, Edalat proposed to Dr. Blaine that the to-be-formed Vivera would, at Blaine Labs' facilities,  manufacture pharmaceuticals – specifically, a sublingual cannabidiol using the "TABMELT technology"  that Edalat told Blaine falsely would belong to Vivera once formed when Edalat well knew he had already conveyed it to another company as described in paragraphs 41(a) through (e) above;  and Edalat proposed that Blaine Labs would distribute the TABMELT product once manufactured.

75.    Commencing in June, 2018 Edalat, Karpinski and Barghi had formed Vivera and had produced its Brochure, referred to in paragraph 41(a) through (e) of this Amended Counterclaim and annexed as Exhibit A hereto. In mid-2018, Edalat began proposing to buy Blaine Labs from Dr. Blaine and make it the basis of an Initial public offering for a new pharmaceutical venture.

76.    This proposal was a fraud. Edalat well knew that he could not take Vivera public both because of his dismal record for failed businesses, liens, judgments, bankruptcies, and an FDA injunction, and also because Vivera could not offer shares based on TABMELT since it had no right to distribute TABMELT as Edalat well knew.

77.    Based on Edalat's representations, and concealments and his promise of Vivera's coming success with TABMELT, Dr. Blaine believed Edalat to be a wealthy and successful businessman and pharmaceutical executive and placed substantial trust in Edalat long with Karpinski and Barghi who all along assisted Edalat in perpetrating the fraudulent representations and concealments on Dr. Blaine, his staff and Baline Labs.

78.   By September 2018, through his fraudulent conduct Edalat had meticulously insinuated his way into Dr. Blaine's life and business. He charmed Dr. Blaine by feigning interest in the history of his business and Dr. Blaine's personal story. He spent time with Dr. Blaine's family and encouraged Dr. Blaine's children to call him "Uncle Paul." He told Dr. Blaine that he would dramatically increase the value of Blaine Labs by Vivera and TABMELT, by providing his executive experience, by investing millions, and leveraging an extensive network of customers and distributors which Edalat had falsely claimed to have had. According to Edalat, he would skyrocket the value of Blaine Labs, take the business, through Vivera, public through an IPO, and make both of them tens of millions of dollars.

79.   Because the Edalat Enterprise members concealed it from him, Dr. Blaine did not realize that Edalat was a complete fake and an experienced con man. Edalat persuaded Dr. Blaine to allow Edalat to help run the business operations of Blaine Labs, and, among other things, to add Edalat as a signatory on the Blaine Lab's commercial bank account into which all sales proceeds from Blaine Labs' sales would be deposited.  Once Edalat's signature was added, he could withdraw any money from that account.

80.   In or around late August to early September 2018, Vivera and Blaine Labs entered into an oral distribution agreement wherein Vivera would act as a distributer for Blaine Labs' Sil-K and Vivera and Dr. Blaine would split the profits 50/50. As soon as the first money from that distribution agreement came into Blaine Labs account after Edalat had access to it, Edalat began withdrawing monies. Between just the short period of

between September 25, 2018 and September 27, 2018 Edalat withdrew:

$973,000 to himself with no justification;

$417,000 to Vivera Pharmaceuticals; and

$100,000 to Verago, which is owned by Karpinski;

81.    Blaine received cashier checks from Paul Edalat (not Vivera) in the amounts of $278,000 and $417,000, which had been drawn from Blaine Labs' bank account. Thus, as of this time Blaine Labs generated $2,375,000. Of that money, Edalat removed $1,490,000 (as described above) and Dr. Blaine was paid $695,000 from cashier's checks sourced from Blaine Labs' account. Edalat had no right to take this money.

82.    On September 28, 2018, after the Vivera and Blaine Labs entered into an oral distribution agreement for the product Sil-K, the product described above in paragraphs 54 through 69 above, Dr. Blaine and Vivera executed the Share Exchange Agreement. Sil-K is not referenced anywhere in the Share Exchange Agreement.

H.    **The Share Exchange Agreement**

83.    Edalat first floated the idea of buying Blaine Labs in November 2017.

84.    By April 2018, Edalat started to push Dr. Blaine to enter into a more involved relationship with Vivera on the following terms:

a.    Pursuant to a Share Exchange Agreement, Dr. Blaine would sell all of his interest in Blaine Labs to Vivera for $10 million in cash and another $10 million in Vivera equity;

BLAINE PARTIES' FIRST AMENDED COUNTERCLAIM

b.      Pursuant to an Executive Employment Agreement, Dr. Blaine would become an employee and officer of Vivera, primarily responsible for its product research and development department, with an annual salary of $120,000;

c.      Pursuant to a Commercial Lease, Blaine Holding would lease to Vivera three warehouses (with Blaine having some space remaining in two of those three) and an office/production facility in Santa Fe Springs, California, where Blaine Labs already was established.

d.      Upon closing, Vivera would take over Blaine Labs' operations and take the combined entity public.

85.     Edalat assured Dr. Blaine that he would benefit tremendously because, in addition to millions of dollars in cash for his ownership interest in Blaine Labs, Dr. Blaine would receive a substantial portion of Vivera's stock, which would skyrocket in value in the wake of the IPO.

86.     Edalat and his team circulated drafts of the Vivera Agreements. Edalat began to push Dr. Blaine to sign the deal documents. Edalat threatened that the due diligence process needed to be complete as soon as possible. The apparent urgency was prompted by Edalat's claims that Vivera planned to do an IPO imminently, but that the IPO could not happen without the Blaine Labs deal being in place. Edalat blamed Dr. Blaine for the delays and told him that his failure to sign the agreements was costing them millions of dollars, both due to lost investments and in attorney's fees.

87.    Not wanting to miss out on the business opportunities he was promised or to let down Edalat, his new friend and trusted partner, Dr. Blaine decided to show his commitment to Edalat and Vivera by signing the agreements in their draft state. The Share Exchange Agreement was signed on September 28, 2018; the Executive Employment Agreement on October 1, 2018; and the Commercial Lease on October 22, 2018.

88.    The Share Exchange Agreement provided that the amount that Vivera would need to pay Blaine for his Blaine Labs shares pursuant to the Share Exchange Agreement would be decreased by the amount to money paid to Dr. Blaine pursuant to the previously created Sil-K oral distribution agreement, wherein Vivera would act as a distributer for Blaine Labs' Sil-K and Vivera and Dr. Blaine would split the profits 50/50.

89.    The Share Exchange Agreement set forth the following:

a.    Upon Closing no later than December 31, 2018, Vivera would pay Dr. Blaine $10,000,000 in cash and $10,000,000 worth of Vivera common stock in exchange for all of his shares in Blaine Labs.

b.    Upon execution of the Share Exchange Agreement, Vivera, according to the representations of Edalat, would deliver to Dr. Blaine 6,700,000 shares of its common stock as a good faith measure, which Dr. Blaine agreed to return if the transaction failed to close.

c.    Prior to closing, the parties would conduct business as usual with both sharing equal access to the bank accounts, and use best efforts to preserve the structure, business relationships, and value of each respective entity, Blaine Labs and Vivera.

d.      Between the date of the Share Exchange Agreement and Closing, Vivera would continue to act as a distributor of one of Blaine Labs products, called Sil-K based on Edalat's and Karpinski's repeated false representations that they had expert and lengthy marketing experience when they had none that had been successful, that they had an existing supply chain when they had none, and that they had existing customers when they had none. Vivera was to deposit into the specially designated account 50% of all profits from that product's sales (the "Profits Account"). Dr. Blaine was entitled to distributions from the Profits Account. Any such distributions would reduce the cash portion owed by Vivera to Blaine Labs upon Closing.

90.     Accordingly, during the period between execution and closing, Dr. Blaine was entitled to 50% of the profits of any Sil-K sales made as distributed by Vivera. If and when the Share Exchange transaction closed, Vivera would be entitled to an offset against the $10,000,000 cash payment in the amount of what Dr. Blaine had received. Such payments were not a down payment or an installment towards the purchase price. Instead, the provision was an incentive for Vivera to do a good job distributing Blaine Labs' products prior to Closing because it reduced the cash payment it would need to make if and when the transaction closed.

91.     The Share Exchange Agreement (annexed as Exhibit B) was fatally incomplete because it failed to include numerous attachments, exhibits, and key information about both companies which were material to the transaction it contemplated. Among other things, the Share Exchange Agreement failed to incorporate Blaine Labs' product list or

language for the parties' Non-Competition Agreement, "Employment Agreement," and "Company Lease," which were crucial for the transaction to close. The Share Exchange Agreement also explicitly called for counsel for each of Blaine Labs and Vivera to provide legal opinions pursuant to a form which is not attached to the Share Exchange Agreement or described therein.

92.     Critically, the Share Exchange Agreement did not include a "Disclosure Schedule." The term "Disclosure Schedule" appears over 100 times in the Share Exchange Agreement and is defined as follows: "Stockholder represents and warrants to Buyer that the statements contained in this Article III are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date […], except as set forth in the disclosure schedule delivered by Stockholder to Buyer on the date of this Agreement."

93.     The Disclosure Schedules were to include, among other things, the following crucial information:

•      Each and every time Vivera had been subject to a legal decree or party to litigation (Section 4.5);

•      Vivera's capitalization and outstanding stocks (Section 4.8);

•      Vivera's financial statements, including balance sheets and income statements (Section 4.10);

•      Vivera's intellectual property rights and interests (Section 4.11);

•      All real property leased or owned by Blaine Labs (Sections 5.6(a) and (b));

BLAINE PARTIES' FIRST AMENDED COUNTERCLAIM

- Blaine Labs' financial statements and projections (Sections 5.8(a) and (b));

- Blaine Labs' liabilities and indebtedness (Section 5.10);

- Blaine Labs' intellectual property rights and interests (Section 5.15);

- Each and every time Blaine Labs had been subject to a legal decree or party to litigation (Section 5.20): and

- Blaine Labs' twenty most valuable customers and suppliers (Section 5.21).

94.   Like the Share Exchange Agreement, the Executive Employment Agreement was incomplete. The Executive Employment Agreement references, but does not include, a "Confidential Information, Non-Disclosure, and Trade Secrets Agreement."

95.   Despite the fact that these agreements were incomplete, Dr. Blaine by that point trusted Edalat and wanted to work with him to bring the transaction to a close so they could all benefit from the promised IPO that Edalat had represented.

96.   Edalat undertook an elaborate charade to show his commitment to the transaction. On the day the Share Exchange Agreement was signed, Edalat presented Dr. Blaine with a check for $10,000,000.00. Edalat made a big deal of it and encouraged Dr. Blaine to pose for pictures. Edalat shook Dr. Blaine's hand and told him to show the check to his foster mother because she would be really proud.

97.   When Dr. Blaine took the check to his bank a few days later, he was informed that the check was no good because the account from which it was to be drawn had insufficient funds.

98.     Edalat never explained to Dr. Blaine why he presented the check on September 28, 2018, or why he insisted on making such a show of that moment. Instead, Edalat reassured Dr. Blaine that the account would be funded and he could deposit the check. It never was funded.

## I.   Edalat Purged the Blaine Labs staff and replaced it with members of the Edalat Enterprise

99.     After the Share Exchange Agreement was executed in its incomplete form, Edalat's friendly mask dropped to reveal the aggressive, hostile, and greedy person he was underneath. Edalat became newly critical of how Blaine Labs was run, despite having been familiar with its operations for the prior year. Edalat took aggressive action to "fix" issues without consulting with Dr. Blaine or other Blaine Labs employees. Dr. Blaine did not realize at the time that these tactics were just a way to get Dr. Blaine out of the way so that Edalat and Counter-Defendants could suck Blaine Labs dry by, *inter alia,*

(a) giving friends and family jobs for doing nothing to be paid for by Blaine Labs,

(b) syphoning money from Blaine Labs to Karpinski's Verago;

(c) leasing/buying Ferraris, BMWs and Land Rovers with money from Blaine Labs;

(d)) upgrading Edalat's mother's house with funds from Blaine Labs; and

(e) cash payments to other Counter-Defendants.

100.   Within the first few weeks of October 2018, Edalat and Vivera fired twenty-two Blaine Labs employees and another five resigned, at least in part because they were intimidated by Edalat's conduct directed at them to have such an effect. These terminations initially focused on Dr. Blaine's family: his eldest son – sales, his eldest

daughter – legal, his wife – social events coordinator, his sister-in-law – trade show coordinator, brother-in-law – warehouse manager, and wife's uncle – product compounder.

101.   Edalat also terminated John Pugh, who is the oldest son of Dr. Blaine's foster brother, who had recently quit his job to join Blaine Labs and had recently welcomed twins to his family. Edalat justified these terminations on the basis that it would look bad when the company went public if too many of Dr. Blaine's family members were on payroll. Yet, in reality, Edalat was acting to isolate Blaine so that Edalat could bring in his associates to bleed the company dry.

102.   To replace the nearly thirty terminations and departures, Edalat caused Blaine Labs to hire Edalat's associates and confidants, none of whom had the same degree of knowledge and experience as the employees they replaced; these new employees and Edalat never intended that they do any work for Blaine Labs and they did not act as real employees putting in anywhere near a full day's work. This was all part of the actions by the Edalat Enterprise to gain control of Blaine Labs and to obtain its money by false and fraudulent pretenses because these employees were not in fact working for the benefit of Blaine Labs as was represented falsely but in fact were simply taking salaries as paid by the Edalat Enterprise members and not adding value to Blaine Labs by their work.

103.   Edalat began fraudulently disbursing substantial sums of Blaine Lab's money to his family and friends without any justification. Edalat put "Vivera's" employees on

Blaine Labs payroll, many of whom were unqualified, did no actual work for Blaine Labs, or both.

104.   Luis Navarro, Edalat's right hand man and confidant, was put on Blaine Labs payroll making $80,000 a year, and received random cash payment of $33,000. In addition, Luis Navarro's family members were put on Blaine Labs payroll despite not doing any actual work. Luz Navarro, Luis's mother, was paid $50,000 for cleaning services, despite the fact that she knew that she never did anything for Blaine Labs. Alonso Navarro and Alejandro Rosales, Luis's cousins, were also paid a salary equivalent to $50,000 a year for sitting around and doing nothing for months, until they were asked to work in warehouse for the final two weeks in January.

105.   Karpinski, Edalat's long-time co-conspirator, was hired as a Vice President of Sales and Marketing at Blaine Labs despite, on information and belief, not having any marketing or sales experience outside of her time with the Edalat Enterprise. Prior to her role in Edalat's enterprise, Karpinski was an actress, failed professional wrestling "diva," and beauty pageant contestant and a clerk in an insurance firm.  Despite no experience, Karpinski was paid a salary equivalent to $80,000 and was given a car allowance for a new Range Rover. In addition, Karpinski's company Verago, LLC, was paid $400,000 directly from a Blaine Labs account without explanation, without cause and without having contributed any benefit to Blaine Labs and this payment was simply a theft and conversion of Blaine Lab's assets. Karpinski participated in this scheme to defraud by, among other actions, accepting the payments she and Verago received from Blaine Labs

and fraudulently converting that money to her own use and the use of Verago without justification and wrongfully.

106.   Farah Barghi, Edalat's sister, was hired by Blaine Labs and was paid a salary equivalent to $50,000, despite only coming into Blaine Labs once or twice. Barghi participated in this scheme to defraud by, among other actions, accepting the payments she received from Blaine Labs, and fraudulently converting that money to her own use and without justification and wrongfully.

107.   Kamyar Gaffari, Edalat's close friend and confidant, was hired as the Vice President of Global Sales, despite having no experience in pharmaceutical sales or the pharmaceutical manufacturing business. He spent no time or energy trying to learn about Blaine Labs, its operations, or its product lines. In over two months of drawing a paycheck from Blaine Labs, he failed to hold a single sales meeting and damaged Blaine Labs' relationships with its retail brokers due to his ignorance about pharmaceutical sales in general and Blaine Labs' product lines.

### J.  The Edalat Enterprise made millions of dollars of unauthorized and therefore fraudulent withdrawals from Blaine Labs' accounts

108.   In addition to the above, between September 1, 2018 and January 31, 2019, $8,107,144.73 in revenues from the sale of Blaine Labs products were deposited into a Blaine Labs account ("Blaine Labs' 6836 Account"). According to the agreement then existing between Edalat and Dr. Blaine and Blaine Labs, money from the sale of Blaine Labs products distributed by Vivera was to be divided 50/50, with half deposited in a Profits Account accessible by Dr. Blaine and available to distribute to him upon his

request. Vivera never opened a Profits Account and instead deposited all the sales revenues into the existing Blaine Labs' 6836 Account.

109.   Between September 25, 2018 and January 12, 2019, Edalat gave Dr. Blaine a series of cashier's checks, totaling $2,111,390.00, drawn from the 6836 Account. Every time Edalat withdrew money from Blaine Labs' 6836 Account to fund a cashier's check for Dr. Blaine, he simultaneously authorized a wire transfer to Vivera's bank account for exactly the same amount.

110.   In addition to these distributions, Vivera and Edalat fraudulently took nearly $4,000,000 from the 6836 Account, including without limitation the following:

- $430,019 in transfers to a Bank of America account in the name of Verago, Inc., which the Blaine Parties are informed and believe is referring to Verago, LLC an entity owned and controlled by Edalat's associate Olivia Karpinski. On information and belief, Karpinski created Counter Defendant Verago, LLC as shell company for the sole purpose to of funneling monies generated by the fraudulent scheme discussed herein to her personally, and to secretly launder the ill-gotten gains back to Edalat.

- Over $200,000 to an entity called "Medlink USA, LLC" which the Blaine Parties do not recognize;

- $100,000 to Ferrari/Maserati to buy Edalat a new car;

- $28,000 to a company called Z Elite Construction, which was paid to renovate Edalat's mother's condominium;

- Tens of thousands of dollars each to Sonia Brown, Luis Navarro, and Tracy Morales, none of whom have any basis to have received disbursements from this account;

- Vivera bought thousands of dollars of equipment, including computers, servers, refrigerators, microwaves, and security cameras and systems, all of which were paid for by Blaine Labs;

- Edalat spent $9,528.07 on a Wells Fargo Credit Card, which was paid for by Blaine Labs;

- Karpinski spent $5,963.74 on a Wells Fargo Credit Card, which was paid for by Blaine Labs, including $350 she spent on makeup *after* Vivera and Edalat terminated and repudiated the Vivera Agreements on January 31, 2019; and

- Kamyar Gaffari – a Vivera employee - spent $4,105.66 on a Wells Fargo Credit Card, which was paid for by Blaine Labs.

111. Thousands of dollars were also fraudulently taken from this account for cars for Edalat, Karpinski, Navarro, and Charles Freeman, another Vivera associate who had been put on Blaine Labs' payroll.

112. Edalat was also given access to the Blaine Labs main operating account, from which he fraudulently took $200,000.

113. Edalat and the above-referenced individuals and entities have retained these funds and refuse to account for or repay them. No benefit was conveyed to Blaine Labs by these individuals or entities, and they were not entitled to receive this money, and these payments were all thus converted from Blaine Labs.

114.   As described above, the Share Exchange Agreement was supposed to close on December 31, 2018. In the months after the signing of the Share Exchange Agreement on September 28, 2018, it became apparent that neither side was prepared to close the transaction by December 31, 2018.

115.   The Share Exchange Agreement provides a pressure release valve, pursuant to which the parties could change or extend the Closing date. They did neither. Instead, Edalat presented to Dr. Blaine a document called "Appendix A to Share Exchange Agreement: Change of Control Provision." Prior to its execution, Dr. Blaine was assured that Appendix A was necessary to allow Vivera to proceed with the IPO Edalat had falsely represented that Vivera was preparing and which was imminent. Dr. Blaine signed it under those false and fraudulent pretexts.

116.   The night that Dr. Blaine signed the document called Appendix A, it was presented to Dr. Blaine in electronic form on Karpinski's iPad. It was therefore sent by wire communication in interstate commerce. Dr. Blaine signed a version of a document that only had the first paragraph and was told that the document called Appendix A only extended the closing date. Dr. Blaine sent his signed version of that one page by wire communication in interstate commerce. However, Edalat and Karpinski fraudulently altered the document to add provisions and terms that were not on the document Dr. Blaine signed or that had been sent to him before he signed it.

117.   In fact, that document called Appendix A, as fraudulently altered by Edalat and Karpinski, says nothing about a closing date. Instead, it purports to retroactively affirm

that Vivera assumed strategic, operational, and procedural control of Blaine Labs on October 1, 2018 and "ensures" that Vivera "will consolidate the operations of Blaine Laboratories, Inc. into its books and records."

118. It also purports to change the Share Exchange Agreement regarding the payments which Dr. Blaine was entitled to receive in exchange for his shares in Blaine Labs. Rather than $10,000,000 in Vivera shares and $10,000,000 in cash, Dr. Blaine would receive $10,000,000 of Vivera shares and $10,000,000 payable as a non-interest bearing, unsecured note payable on January 1, 2020, towards which $2,000,000 already was paid. Appendix A purports to dramatically re-frame the deal contemplated by the Share Exchange Agreement and allocates all of the risk in the transaction to Dr. Blaine. Instead of a $10,000,000 cash payment, all he gets are two pieces of paper – an unsecured note and shares in Vivera. If Vivera is insolvent a year later (a reasonable assumption given Edalat's track record), Dr. Blaine gets nothing for Blaine Labs – in essence, his whole life's work.

119. Vivera provided no new consideration for the document called Appendix A.

K. **Edalat reneged on previously agreed terms.**

120. Following the execution of Appendix A, Dr. Blaine retained Roby Yadegar to represent him in finalizing all the documentation necessary to complete the transaction. Instead of moving towards fruition, the relationship between the parties quickly deteriorated.

121.  In the weeks that followed the execution of Appendix A, Mr. Yadegar and Vivera's counsel, Dan Donahue, discussed what, if anything, Appendix A meant and how it would impact the Share Exchange Agreement's Closing. During these discussions, Mr. Yadegar told Mr. Donahue that Appendix A was invalid on its face. Mr. Donahue agreed. They proceeded and continued to negotiate as if it did not exist.

122.  Around this time, Vivera and Edalat announced that their due diligence efforts had uncovered two facts which required a renegotiation of the Share Exchange Agreement. They stated that these were that:

- Dr. Blaine had purportedly misrepresented Blaine Labs' revenues at $7,500,000; and

- Blaine Labs, Dr. Blaine, and an employee of Blaine Labs had paid to resolve claims involving allegations of wrongful termination, gender discrimination, and sexual harassment.

123.  These assertions were knowingly false. In fact, Edalat was well-aware of these facts and had been since long before the parties signed the Share Exchange Agreement. Karpinski also knew this information was false as is shown in the paragraphs next below.

124.  On January 10, 2018, more than nine months before the Share Exchange Agreement was signed, Dr. Blaine sent Edalat and Karpinski an email for the express purpose of disclosing Blaine Labs' total revenue. The email unambiguously states that Blaine Labs' 2017 revenue was $5,754,753.94, not $7,500,000.

125.  In August 2018 – over a month before the Share Exchange Agreement was signed, Edalat attended a meeting at Dr. Blaine's offices with Dr. Blaine and Blaine Labs' employee and human resources manager, Jennifer Broshar. During the meeting, Dr. Blaine specifically disclosed the fact that former employees of Blaine Labs had made claims of, among other things, wrongful termination, gender discrimination, and sexual harassment against Dr. Blaine, Blaine Labs, and Blaine Labs' employees. Edalat told Dr. Blaine and Ms. Broshar that he understood these types of claims were very common in the workplace. He did not ask any follow-up questions.

126.  Further, by the time Dr. Blaine executed the Share Exchange Agreement, all of these claims had been resolved and Dr. Blaine was unaware of any facts that would reasonably lead him to believe that any new claims would be filed.

127.  Moreover, as Edalat well-knew, the Disclosure Schedules called for by the Share Exchange Agreement would have included all of this information, but the Share Exchange Agreement was executed without the Disclosure Schedules, specifically because Edalat pressured Dr. Blaine to do so and assured Dr. Blaine that the parties could get the deal done.

128.  Nevertheless, Edalat and Vivera fraudulently insisted that these "discoveries" required a substantial renegotiation of the terms of the Share Exchange Agreement. In particular, they demanded that the Share Exchange Agreement be amended to be more similar to Appendix A – which further evidences that Edalat and Vivera knew that the document called Appendix A was invalid on its face.

129.   Recognizing the risk posed by this abrupt swerve in position by Edalat and Vivera, Dr. Blaine attempted to renegotiate a restated and amended Share Exchange Agreement on mutually agreeable terms. These efforts failed.

**L.  Edalat stole Blaine Labs' property**

130.   On January 31, 2019, in response to an offer made by Mr. Yadegar, Dr. Blaine's counsel, Vivera's attorney, Mr. Donahue, sent an email approved by Edalat (the "Termination Email"). A copy of the Termination Email is attached hereto and incorporated herein as Exhibit C. The email clearly and unambiguously terminated and repudiated the entire transaction contemplated between the parties, as follows:

- The Share Exchange Agreement was cancelled;

- Vivera expected a refund of the $2,111,850 it had paid to Dr. Blaine and another $200,000 it had spent on tenant improvements;

- Shares previously issued to Dr. Blaine were cancelled;

- Dr. Blaine's employment with Vivera was cancelled;

- Vivera would relinquish possession of two of the three buildings identified in the Commercial Lease, but would continue to lease the third;

- Vivera's employees would be moved off Blaine Labs' payroll; and

- Vivera and Blaine Labs would revert to what their relationship was like in the first half of 2018, and Blaine Labs would manufacture Vivera-branded products pursuant to a new, to-be-negotiated manufacturing agreement.

131.   In text messages exchanged following the Termination Email, Edalat told Dr. Blaine that he "must regretfully unwind the offer and proposal." He also told Dr. Blaine "to call [him] ASAP to discuss how we will unwind everything." In response, Dr. Blaine expressed regret and wished that the transaction could be salvaged, but also made clear that he understood that the entire transaction was over and it was time for the parties to go their own separate ways.

132.   The parties and their counsel's subsequent conduct affirmed that the transaction was over. They engaged in discussions throughout the first week and a half of February in an attempt to determine how they could fairly disentangle themselves.

133.   This process of untangling the companies immediately ran into a major hurdle, when Vivera's employees started stealing Blaine Labs products from Building One of the Blaine Labs' Complex.

134.   On February 1, 2019, just one day after Vivera sent the Termination Email, Vivera employee Luis Navarro instructed other Vivera employees to move the entire inventory of the Sil-K and scar pads from the Vivera warehouse at 11037 Lockport Avenue, where they had been kept, to the warehouse at 11100 Greenstone Avenue, which Vivera was occupying as described in the Termination Letter.  Mr. Navarro told Blaine Labs employee Pedro Kuang that he was moving the products to the "Vivera building" so they would be safe.  A few days later, Mr. Navarro approached another Blaine Labs employee in a rush, asking this employee to move even more products to the "Vivera building."

135.   Other Vivera employees also stole certain raw ingredients owned by Blaine Labs and moved them to the "Vivera building."  Although Vivera took control of a Blaine Labs building, Vivera never paid any rent and still refuses to relinquish control nearly three years later. Vivera took almost all of the Sil-K and scar pads and a large volume of Blaine Labs ingredients, equipment, and products.

136.   Over the next few days, Vivera employees continued to take products, equipment, components, and other property that belonged to Blaine Labs. The total value of these products, equipment, components, and materials exceeds $20,000,000. Vivera even stole Blaine Labs' employment records that were in the warehouse.

137.   All of the above-described product takings were for the benefit of the Enterprise which thereafter fraudulently sold these products for their own profit and therefore sold these stolen products in interstate commerce in violation of 18 U.S.C. sections 2314 and 2315, which are predicate acts within the meaning of the RICO statute.

138.   Vivera refused to return the above-described misappropriated items.  Vivera employees began to sneak the Sil-K and scar pads out of the building Vivera was occupying, carrying large volumes of them in backpacks and loading them into cars.

139.   Commencing on or about February 1, 2019, Vivera began selling the stolen Sil-K under Blaine Labs' name at a substantial discount from their standard market price to multiple wholesalers.  The activity is a violation of 18 U.S.C. section 2320, a predicate act under RICO, as trafficking in goods bearing counterfeit marks because these sales were of good bearing trademarks not belonging to Vivera and not sold with the consent of the

owner of the trademark. By dumping the stolen product in the market this way, Vivera substantially undermined the market for the products, damaged Blaine Labs' reputation and relationship with wholesalers, and impaired Blaine Labs' ability to sell similar products. Dr. Blaine and Blaine Labs are also informed and believe and thereon allege that Edalat promised three sperate wholesalers exclusive rights to sell Blaine Labs' Sil-K, which was an impossibility for Blaine Labs to perform.

140.   Vivera has and continues to refuse to account for what it took from Blaine Labs or to return any of it.

141.   During this period, Blaine Labs and its information technology contractors discovered that Edalat had illicitly installed software on the servers and computers of Blaine Labs. The two pieces of software were TightVNC, an open-source remote control client, and Datto RRM, a remote control and system monitoring software used to monitor systems on the network. No one at Blaine Labs authorized the installation of either program. This software had been installed on February 2, 2019, just after the Share Exchange Agreement was terminated. Blaine Labs had difficulty removing them. So much so that Blaine Labs had to buy new servers.

142.   The above-described device installation violates 18 U.S.C. section 1832 as involving economic espionage and theft of trade secrets and is thus a predicate act under RICO.

143.   Given that these programs provided unknown individuals with unfettered access to Blaine Labs' computer systems, Blaine Labs was forced to replace its servers to

ensure that neither these nor any other monitoring software was running. Blaine Labs is informed and believes and, on that basis, alleges that this software was installed by Vivera and was used to access and download Blaine Labs' document and files before they were discovered and removed.

144.   Meanwhile, in reliance on the repeated communications from Vivera, Edalat, and their attorneys that the transactions were over, Dr. Blaine and Blaine Labs took steps to terminate Vivera's access to Blaine Labs' records, inventory, and computer systems, and to take possession of the real property.

### FIRST CLAIM FOR RELIEF

### RICO Violation Under 18 U.S.C. 1962(c)

### (Brought by Dr. Blaine and Blaine Labs against Vivera, Edalat, Karpinski, Verago, and Barghi)

145.   The allegations of paragraphs 1 through 144 are incorporated herein by reference.

146.   Vivera, Edalat, Karpinski, Verago and Barghi while acting in and affecting interstate commerce, did form an illegal Enterprise and conduct and participate in its racketeering activities within the meaning of 18 U.S.C.§1961(4). These entities and individuals associated together as the Edalat Enterprise for the common purpose of engaging, conducting and participating in a pattern of racketeering to take over Blaine Labs through fraudulent pretenses in order to steal its cash and property and to obtain that cash and property and thus injure Dr. Blaine and Blaine Labs in their business and

property, within the meaning of 18 U.S.C. 1964. The pattern of racketeering involved and still involves the following predicate acts:

147.   The Edalat Enterprise and its members engaged in many acts of wire fraud in violation of 18 U.S.C. section 1343. Specifically, as more fully alleged above, they conspired to infiltrate and seize control of Blaine Laboratories, Inc, its cash, and other assts including tangible and intellectual property, for the illegal profit of the Edalat Enterprise and its members.

148.   In furtherance of their scheme to defraud Dr. Blaine and Blaine Labs and for the purpose of executing such scheme to defraud, and to obtain money by false and fraudulent pretenses, commencing in or around August 2018 and continuing to the present, the Edalat Enterprise caused to have sent by interstate wire communications used by the Federal Reserve's interbank electronic deposit and collection process, the following payments from Blaine Labs to the persons listed below by direct deposit on the following dates and in the following amounts all of which were procured by fraud as alleged above:

| Name | Date | Gross Pay | Wire Amount |
| --- | --- | --- | --- |
| **Paul Edalat** | 10/19/2018 | $    9,615.39 | $    5,749.70 |
| | 11/2/2018 | $    9,615.39 | $    5,749.68 |
| | 11/16/2018 | $       750.00 | $       685.13 |
| | 11/16/2018 | $    9,615.39 | $    6,505.86 |
| | 11/30/2018 | $    9,615.39 | $    6,505.84 |
| | 12/14/2018 | $    9,615.39 | $    7,255.86 |
| | 12/14/2018 | $       750.00 | $            - |

|  |  |  |  |
|---|---|---|---|
|  | 12/28/2018 | $ 9,615.39 | $ 6,505.85 |
|  | 1/11/2019 | $ 9,615.39 | $ 6,528.94 |
|  | 1/25/2019 | $ 9,615.39 | $ 6,528.92 |
|  | 1/25/2019 | $ 750.00 | $ 750.00 |
| **SUBTOTAL PAUL EDALAT** |  | **$ 79,173.12** | **$ 52,765.78** |
| **Kamyar Ghaffari** | 12/14/2018 | $ 2,308.00 | $ 1,899.48 |
|  | 12/28/2018 | $ 4,615.50 | $ 3,271.55 |
|  | 1/11/2019 | $ 4,615.50 | $ 3,287.57 |
|  | 1/25/2019 | $ 4,615.50 | $ 3,287.56 |
| **SUBTOTAL KAMYAR GHAFFARI** |  | **$ 16,154.50** | **$ 11,746.16** |
| **Alonso Navarro** | 10/19/2018 | $ 1,923.10 | $ 1,659.53 |
|  | 11/2/2018 | $ 1,923.10 | $ 1,659.52 |
|  | 11/16/2018 | $ 1,923.10 | $ 1,659.52 |
|  | 11/30/2018 | $ 1,923.10 | $ 1,659.52 |
|  | 12/14/2018 | $ 1,923.10 | $ 1,659.53 |
|  | 12/28/2018 | $ 1,923.10 | $ 1,659.52 |
|  | 1/11/2019 | $ 1,923.10 | $ 1,664.67 |
|  | 1/25/2019 | $ 1,923.10 | $ 1,664.66 |
| **SUBTOTAL ALONSO NAVARRO** |  | **$ 15,384.80** | **$ 13,286.47** |
| **Luis H. Navarro** | 10/5/2018 | $ 1,923.09 | $ 1,659.51 |
|  | 10/19/2018 | $ 3,269.24 | $ 2,655.76 |
|  | 11/2/2018 | $ 3,269.24 | $ 2,655.78 |

BLAINE PARTIES' FIRST AMENDED COUNTERCLAIM

| | | | |
|---|---|---|---|
| 1 | 11/16/2018 | $ 3,269.24 | $ 685.13 |
| 2 | 11/16/2018 | $ 750.00 | $ 2,655.77 |
| 3 | 11/30/2018 | $ 3,269.24 | $ 2,655.78 |
| 4 | 12/14/2018 | $ 3,269.24 | $ 3,405.76 |
| 5 | 12/14/2018 | $ 750.00 | $ - |
| 6 | 12/28/2018 | $ 3,269.24 | $ 2,655.78 |
| 7 | 1/11/2019 | $ 3,269.24 | $ 2,663.22 |
| 8 | 1/25/2019 | $ 3,269.24 | $ 2,663.20 |
| 9 | 1/25/2019 | $ 750.00 | $ 750.00 |
| **SUBTOTAL LUIS NAVARRO** | | **$ 30,327.01** | **$ 25,105.69** |
| **Luz Navarro** | 10/19/2018 | $ 1,923.10 | $ 1,488.34 |
| | 11/2/2018 | $ 1,923.10 | $ 1,488.33 |
| | 11/16/2018 | $ 1,923.10 | $ 1,488.33 |
| | 11/30/2018 | $ 1,923.10 | $ 1,488.33 |
| | 12/14/2018 | $ 1,923.10 | $ 1,488.34 |
| | 12/28/2018 | $ 1,923.10 | $ 1,488.33 |
| | 1/11/2019 | $ 1,923.10 | $ 1,496.67 |
| | 1/25/2019 | $ 1,923.10 | $ 1,496.66 |
| **SUBTOTAL LUZ NAVARRO** | | **$ 15,384.80** | **$ 11,923.33** |
| **Alejandro Rosales** | 10/5/2018 | $ 1,760.00 | $ 1,534.73 |
| | 10/19/2018 | $ 1,923.00 | $ 1,659.45 |
| | 11/2/2018 | $ 1,923.00 | $ 1,659.44 |
| | 11/16/2018 | $ 1,923.00 | $ 1,659.44 |
| | 11/30/2018 | $ 1,923.00 | $ 1,659.44 |

BLAINE PARTIES' FIRST AMENDED COUNTERCLAIM

| | | | | |
|---|---|---|---|---|
| | 12/14/2018 | $ | 1,923.00 | $ | 1,659.44 |
| | 12/28/2018 | $ | 1,923.00 | $ | 1,659.44 |
| | 1/11/2019 | $ | 1,923.00 | $ | 1,664.58 |
| | 1/25/2019 | $ | 1,923.00 | $ | 1,664.58 |
| **SUBTOTAL ALEJANDRO ROSALES** | | **$ 17,144.00** | | **$ 14,820.54** |
| **Farah Barghi** | 10/19/2018 | $ | 2,308.00 | $ | 1,719.52 |
| | 11/2/2018 | $ | 2,308.00 | $ | 1,719.54 |
| | 11/16/2018 | $ | 2,308.00 | $ | 1,719.52 |
| | 11/30/2018 | $ | 2,308.00 | $ | 1,719.54 |
| | 12/14/2018 | $ | 2,308.00 | $ | 1,719.52 |
| | 12/28/2018 | $ | 2,308.00 | $ | 1,719.52 |
| | 1/11/2019 | $ | 2,308.00 | $ | 1,728.10 |
| | 1/25/2019 | $ | 2,308.00 | $ | 1,728.12 |
| **SUBTOTAL FARAH BARGHI** | | **$ 18,464.00** | | **$ 13,773.38** |
| Olivia L Karpinski | 10/19/2018 | $ | 3,077.00 | $ | 2,139.93 |
| | 11/2/2018 | $ | 3,077.00 | $ | 2,139.93 |
| | 11/16/2018 | $ | 3,077.00 | $ | 2,139.93 |
| | 11/16/118 | $ | 750.00 | $ | 614.91 |
| | 11/30/2018 | $ | 3,077.00 | $ | 2,139.93 |
| | 12/14/2018 | $ | 3,077.00 | $ | 2,889.93 |
| | 12/14/2019 | $ | 750.00 | $ | - |
| | 12/28/2018 | $ | 3,077.00 | $ | 2,139.93 |
| | 1/11/2019 | $ | 3,077.00 | $ | 2,149.07 |

BLAINE PARTIES' FIRST AMENDED COUNTERCLAIM

| | | | |
|---|---|---|---|
| 1/25/2019 | $ 3,077.00 | $ 2,149.07 |
| 1/25/2019 | $   750.00 | $   750.00 |
| **SUBTOTAL**<br>**OLIVIA L KARPINSKI** | **$ 25,366.00** | **$ 19,252.63** |

149.  Each of the above direct deposit payments for fraudulent employees purportedly but falsely for the benefit of Blaine Labs was an instance of wire fraud because the Payees of these payments were in fact performing services for Vivera instead of for their nominal employer Blaine Labs and /or were not performing any actual work for Vivera as was well known to the Edalat Enterprise members.  Each of the payments was made by a wire transfer and is therefore a predicate act under 18 USC §1961 because each of these wirings was a wire communication in interstate commerce and was in furtherance of the Edalat Enterprise's scheme to defraud Blaine Labs and Dr. Blaine and to obtain their money under false and fraudulent pretenses, all in violation of 18 U.S.C. section 1343, a predicate crime under RICO.

150.  In addition to the above wire transfers, Edalat also caused the following wire transfers to be made and sent by interstate wire communications used by the Federal Reserve's interbank electronic deposit and collection process:

  a.  Direct Branch Withdrawals by Edalat:

| Date | Amount | Memo |
|---|---|---|
| 9/25/2018 | $60,000.00 | Branch Withdrawal by Edalat |
| 9/25/2018 | $278,000.00 | Branch Withdrawal by |

| | | | Edalat |
|---|---|---|---|
| | 9/25/2018 | $278,000.00 | Branch Withdrawal by Edalat |
| | 9/26/2018 | $417,000.00 | Branch Withdrawal by Edalat |
| | 9/28/2018 | $10,000.00 | Branch Withdrawal by Edalat |
| | 10/4/2018 | $72,000.00 | Branch Withdrawal by Edalat |
| | 10/9/2018 | $159,120.00 | Branch Withdrawal by Edalat |
| | 10/15/2018 | $194,600.00 | Branch Withdrawal by Edalat |
| | 10/24/2018 | $89,500.00 | Branch Withdrawal by Edalat |
| | 11/18/2018 | $336,370.00 | Branch Withdrawal by Edalat |
| | 11/14/2018 | $27,800.00 | Branch Withdrawal by Edalat |
| | 11/16/2018 | $96,456.00 | Branch Withdrawal by Edalat |
| | 11/19/2018 | $59,983.00 | Branch Withdrawal by Edalat |
| | 11/29/2018 | $30,000.00 | Branch Withdrawal by Edalat |
| | 11/29/2018 | $60,075.00 | Branch Withdrawal by Edalat |
| | 12/17/2018 | $68,807.00 | Branch Withdrawal by Edalat |

BLAINE PARTIES' FIRST AMENDED COUNTERCLAIM

| 12/26/2018 | $25,000.00 | Branch Withdrawal by Edalat |
|---|---|---|
| 12/26/2018 | $50,000.00 | Branch Withdrawal by Edalat |
| 12/31/2018 | $213,750.00 | Branch Withdrawal by Edalat |
| 1/2/2019 | $38,467.00 | Branch Withdrawal by Edalat |
| 1/7/2019 | $25,800.00 | Branch Withdrawal by Edalat |
| 1/14/2019 | $69,245.00 | Branch Withdrawal by Edalat |
| 1/31/2019 | $40,000.00 | Branch Withdrawal by Edalat |
| 1/31/2019 | $7,500.00 | Branch Withdrawal by Edalat |
| **Edalat Total:** | **$2,707,473.00** | |

b.    Wire Transfers to, Karpinski (Verago),  Navarro, Ghaffari, Brown, and Others.

| Date | Amount | Memo |
|---|---|---|
| 9/25/2018 | $40,000.00 | Verago |
| 9/26/2018 | $60,000.00 | Verago |
| 10/4/2018 | $10,000.00 | Verago |
| 10/9/2018 | $18,000.00 | Verago |
| 10/24/2018 | $12,750.00 | Verago |
| 11/8/2018 | $46,323.00 | Verago |

BLAINE PARTIES' FIRST AMENDED COUNTERCLAIM

| | | | |
|---|---|---|---|
| 11/14/2018 | $4,000.00 | Verago | |
| 11/16/2018 | $31,625.00 | Verago | |
| 11/20/2018 | $19,476.00 | Verago | |
| 11/30/2018 | $19,500.00 | Verago | |
| 12/6/2018 | $22,685.00 | Verago | |
| 12/18/2018 | $17,820.00 | Verago | |
| 12/31/2018 | $75,000.00 | Verago | |
| 1/7/2019 | $8,000.00 | Verago | |
| 1/14/2019 | $27,700.00 | Verago | |
| 1/17/2019 | $10,000.00 | Verago | |
| 1/23/2019 | $7,140.00 | Verago | |
| 1/15/2019 | $6,500.00 | Wynn Las Vegas | |
| 10/26/2018 | $28,000.00 | Z Elite Construction | |
| 12/18/2018 | $32,000.00 | Kami Ghaffari | |
| 1/2/2019 | $33,094.00 | Luis Navarro | |
| 11/8/2018 | $76,950.00 | Medlink USA | |
| 11/16/2018 | $37,950.00 | Medlink USA | |
| 12/18/2018 | $39,600.00 | Medlink USA | |
| 1/14/2019 | $39,600.00 | Medlink USA | |
| 1/7/2019 | $60,000.00 | Sonia Brown | |
| 10/4/2018 | $100,000.00 | Ferrari/Maserati | |
| 9/26/18 | $417,000 | Vivera | |
| 10/4/18 | $72,000 | Vivera | |
| 10/9/18 | $127,600 | Vivera | |
| 10/24/18 | $89,550 | Vivera | |
| 11/8/18 | $336,370 | Vivera | |
| 11/14/18 | $27,800 | Vivera | |

BLAINE PARTIES' FIRST AMENDED COUNTERCLAIM

| 11/16/18 | $96,456 | Vivera |
|---|---|---|
| 11/30/18 | $60,075 | Vivera |
| 12/6/18 | $69,887 | Vivera |
| 12/29/18 | $213,750 | Vivera |
| 1/2/19 | $38,467 | Vivera |
| 1/12/19 | $79,245 | Vivera |
| **Total** | **$2,511,913.00** | |

151.  Each of these wire transfers was a RICO predicate act because these payments were made under the false pretenses alleged herein and by wire communications.

152.  In addition, the following were RICO predicate crimes as separate actions of wire fraud for the same reasons as alleged in paragraph 149 and 151:

    (a)    The wirings of bank transfers to the LIWA bank that were caused by Edalat as alleged in paragraphs 34 through 36;

    (b)    The wiring from Edalat to Barghi on April 22, 205 about concealing Edalat's association with Scilabs's FDA injunction as alleged in paragraphs 40;

    (c)    The wirings alleged in paragraph 41 (a) through (e) in 2018 and 2019 falsely asserting that Vivera had exclusive rights to the TABMELT technology when in fact as the Edalat Enterprise well knew those rights belonged to another company and not to Vivera; and

    (d)    The wiring alleged in paragraph 116 that was sent to Dr. Blaine by Karpinski a fraudulent Document purporting to simply change the closing date

for the contemplated Share Exchange Agreement when in fact it fraudulently intended to change the entire agreement in an attempt to defraud Dr. Blaine and Blaine Labs.

153.    In addition to the above-described multiple acts of wire fraud, the Edalat Enterprise has committed the following predicate crimes:

154.  In addition to wire fraud, the Edalat Enterprise has engaged in other RICO predicate acts and crimes:

(a)    theft of trade secrets and economic espionage in violation of 18 U.S.C. section 1832;

(b)    money laundering in violation of 18 U.S.C. sections 1956 and 1957;

(c)    trafficking in goods bearing counterfeit trademarks in violation of 18 U.S.C. section 2320;

(d)    interstate transportation of stolen property in violation of 18 U.S.C. sections 2314 and 2315, and

(e)    bankruptcy fraud in violation of 18 U.S.C. section 157, all as detailed above.

155.  The activity listed above constitutes a pattern of racketeering activity and crimes pursuant to 18 U.S.C. § 1961(5), all engaged in by the Edalat Enterprise and its members, Vivera, Edalat, Karpinski, Verago, and Barghi, who each conducted and participated in this illegal activity in the manner alleged in this Amended Counterclaim which constitutes a violation of 18 U.S.C. section 1962(c) and they are thus liable to Dr.

Blaine and Blaine Labs for the injury to their business and property under 18 U.S.C. section 1964.

156.  Dr. Blaine and Blaine Labs have been damaged by the Edalat Enterprise in the amount of at least $30,000,000 as will be proven at trial and as a result the Enterprise and each of its members, Vivera, Edalat, Karpinski, Verago, and Barghi, are liable to Dr. Blaine and Blaine Labs in the amount so proved and these should be awarded against them jointly, and should be trebled and with reasonable attorney's fees awarded.

**SECOND CLAIM FOR RELIEF**

**RICO Violation Under 18 U.S.C. 1962(d)**

**(Against Vivera, Edalat, Karpinski, Verago, and Barghi)**

157.  The allegations of paragraphs 1 through 156 are incorporated herein by reference.

158.  Vivera, Edalat, Karpinski, Verago and Barghi each combined with the other and conspired with the other to violate 18 U.S.C. section 1962(c) in the manners alleged herein and actively participated in the illegal conduct alleged above in order to bring its predicate criminal acts about and therefore each of them have violated 18 U.S.C. section 1961(d) and they are thus liable to Dr. Blaine and Blaine Labs for the injury to their business and property under 18 U.S.C. section 1964.

159.  Dr. Blaine and Blaine Labs have been damaged by the Edalat Enterprise in the amount of at least $30,000,000 as will be proven at trial and as a result the Enterprise and each of its members, Vivera, Edalat, Karpinski, Verago, and Barghi, are liable to Dr.

BLAINE PARTIES' FIRST AMENDED COUNTERCLAIM

Blaine and Blaine Labs in the amount so proved and this amount should be trebled along with reasonable attorney's fees.

## THIRD CLAIM FOR RELIEF

### Patent Infringement

### (Brought by Dr. Blaine Labs against Vivera and Edalat)

160.   The allegations of paragraphs 1 through 159 are incorporated herein by reference.

161.   On September 7, 2000, Robert Blaine filed a Patent Application for a United States Patent for a method to reduce scars using a scar care product in the form of an improved silicone sheet for flattening and fading scars, which is impregnated with an antioxidant and/or an antimicrobial.

162.   On or about June 3, 2003, United States Patent No. 6,572,878 (hereinafter, the '878 patent), was issued to the Dr. Blaine. Prior to filing this action, the patent was assigned to Blaine Labs and it therefore has the right to enforce the patent against anyone for infringing acts during the relevant time period until the end of the patent's lifetime, which ended October 9, 2020.

163.   The invention in relation to which this right of enforcement was granted is defined by Claim 1 of the patent:

A method of minimizing the appearance of scars comprising: applying a semi-occlusive device to a closed wound on the skin that has or may potentially develop a scar, said device comprising a one layer silicone sheet infused with an antioxidant and an antimicrobial.

BLAINE PARTIES' FIRST AMENDED COUNTERCLAIM

164.   A true and correct copy of the patent is attached hereto as Exhibit D and incorporated herein by this reference.

165.   In accordance with 35 U.S.C. section 287, Dr. Blaine and Blaine Labs have placed the patent number 6,572,878 on packaging for the would care gels it manufactures and sells.

166.   The Edalat and Vivera have induced infringement of the Letters Patent by selling, and using scar care gel pads that embody the patented invention, which has injured Blaine Labs by depriving them of revenue that should be rightfully theirs. End users of the Vivera scar care gel pads are direct infringers of the '878 patent by treating scars with the pads.

167.    Edalat and Vivera have sold products with Blaine Labs patent number on the product.

168.   The manner of infringement is that Edalat and Vivera have induced others to use the patented process by distributing and selling products intended for use in treating scars, as covered by the above-referenced Blaine Labs '878 patent.

169.   On March 19, 2019, Blaine and Blaine Labs, by and through its patent counsel, sent a cease-and-desist letter to Edalat and Vivera demanding that they cease and desist their infringement of the patent.  A true and correct copy of that letter is attached hereto as Exhibit E.

170.   Despite the cease-and-desist letter Edalat and Vivera continued selling, and/or using scar care gels that embody the Blaine Labs' patented invention.

171.   Blaine Labs has suffered damages due to said infringement in that Edalat and Vivera have sold an amount of infringing product according to proof but believed to be in excess of $5,000,000 without any compensation to Blaine Labs.

172.   The infringement of the patent was willful.  The patent was at all times alleged herein a valid and enforceable patent and Edalat and Vivera were fully aware at all times of the existence of the patent and that their actions were infringing.  The willfulness of the infringement justifies an award of treble damages pursuant to 35 U.S.C. §284. In view of all the facts stated herein and the willful infringement, this is an exceptional case justifying an award of attorney fees to Blaine Labs, pursuant to 35 U.S.C. section 285.

173.   As a result of the infringement, Blaine and Blaine Labs seek (a) an accounting for damages; (b) an award of treble damages pursuant to 35 U.S.C. §284; and (c) interest, attorney's fees and costs as allowable by law.

### FOURTH CLAIM FOR RELIEF

### Common Law Trademark Infringement and Unfair Competition for Sale of Sil-K Gel Pads and Kits

### (Brought by Blaine Labs against Vivera and Edalat)

174.   The allegations of paragraphs 1 through 173 are incorporated herein by reference.

175.   On or about December 14, 2017, Blaine Labs entered into a Supplier / Distributor Agreement with Solutech Pharmaceuticals, LLC, whereby Blaine Labs would produce and sell Scar Pads subject to Blaine Lab's assigned Letters of Patent 6,572,878 to

Solutech, which Blaine Labs would package and label as "Sil-K" (the "Mark") silicone pads, a "Silicone Gel Matrix NDC #70350-2615-0," for distribution by Solutech.

176.   Pursuant to the Agreement, subsequent oral modifications to the Agreement, Solutech, Blaine Labs manufactured a substantial inventory of Scar Pads and packaging. Thereafter Solutech stopped selling the Sil-K labeled Scar Pads, abandoning the contract requiring Blaine Labs to mitigate its damages by selling the Sil-K labeled Scar Pads to alternative pharmaceutical brokers and wholesalers.

177.   Solutech's cessation of using the Sil-K mark constituted abandonment of the Mark, which Blaine Labs thereafter adopted and commenced sales on or about September 24, 2018 using the Sil-K trademark. Such sales by Blaine Labs created common law trademark rights for the Sil-K brand.

178.   On or about January 31, 2019, Edalat was terminated as the Chief Executive Officer of Blaine Labs. At or about this time, Edalat instructed persons associated with Vivera to take millions of dollars of Sil-K kits and Scar Pads from Blaine Labs warehouse, which stolen product Vivera, as instructed by Edalat to do so, later sold and distributed this stolen product utilizing the Sil-K trademark.

179.   Edalat and Vivera, and each of them, do not have permission to use the Si-K trademark or to advertise or offer to sell any products using the mark.

180.   From on or about January 31, 2019, and forward, continuing through the date of  filing of this Complaint, Edalat and Vivera, and each of them, have, without Blaine Labs' consent, reproduced and copied the Sil-K mark in packaging, advertising and video

promotion and applied the reproduction and copy to labels and advertisements intended to

be used in conjunction with the sale or distribution of Sil K-Scar Pads in the United States

by Vivera to persons and companies other than plaintiff.

181.   Such unauthorized use further includes creation and use of packaging using the

Sil-K mark.

182.   This use of the Sil K mark is likely to cause confusion or mistake or to deceive

members of the public as to the source of origin of the Scar Pads that are sold or

distributed in conjunction with the labels or advertisements.

183.   These actions by Edalat and Vivera constitute common law trademark

infringement and unfair competition.

184.   Edalat and Vivera knew that the labels, videos and advertisements and

promotions containing the reproduction of Blaine Labs' Sil-K trademark were intended to

be used by them and were used to cause confusion or mistake or to deceive the public as

to the source of Sil-K Scar Pads in conjunction with which the labels, videos and

advertisements were to be used.

185.   Plaintiff is informed and believes, and on that basis alleges, that as a direct and

proximate result of Defendants' infringement of the Sil-K mark, as described above,

Defendants have derived profits in an amount currently unknown, but in excess of

$5,000,000.

186.   As a further direct and proximate result of Edalat's and Vivera's trademark

infringement, as described in this Count, Blaine Labs has sustained damages in an amount

according to proof, consisting of lost and diverted sales in amounts to be proved at trial which profits should be an additional damage amount awarded to Dr. Blaine and Blaine Labs.

### FIFTH CLAIM FOR RELIEF

### Unfair Competition and False Designation Under Lanham Act 15 USC §1125 and Common Law Use of Blaine Labs PMN Number

### (Brought by Blaine Labs against Edalat and Vivera)

187.   The allegations of paragraphs 1 through 186 are incorporated herein by reference.

188.   Sil-K is "private label" (brand name) for a silicone gel scar treatment pad manufactured by Blaine Labs in the FDA licensed Blaine Labs facility under a Blaine Labs patent (US Patent Number 6,572,878) for a Method and Device for Treating Scars.

189.   These "private label" pads are registered with insurance companies and pharmacy benefit management databases and therefore have high reimbursement rates. During the relevant time period, Sil-K "private label" scare care pads were being reimbursed at a rate of $1900-$4500 per box (four pads).

190.   On or around December 14, 2017, long before the execution of the Share Exchange Agreement (on September 2018) and before Vivera even existed (meaning before April 2018), Blaine Labs entered into a distribution agreement with Solutech Pharmaceutical LLC ("Solutech"), in which Blaine Labs would manufacture its "gel matrix" scar care pads for Solutech to use in a private label product, *i.e.*, Sil-K. This

product is a medical device within the meaning of FDA enforcement regulations described below.

191. Section 510(k) of the Food, Drug and Cosmetic Act requires device manufacturers who must register to notify FDA of their intent to market a medical device at least 90 days in advance. This is known as Premarket Notification - also called PMN or 510(k). This allows FDA to determine whether the device is equivalent to a device already placed into one of the three classification categories.

192. As part of this transaction, Solutech used Blaine Labs' 510(k) or PMN (No. K001608) on the Sil-K's product filing with the FDA. This 510(k) or PMN number is critical both for FDA compliance and for receiving the higher reimbursement rate from insurance carriers.

193. Solutech used Blaine Labs' FDA PMN (No. K001608) which has value.

194. As part of the Solutech distribution agreement, Blaine Labs was to have 20,000 scar pads on hand at all times.

195. The Blaine Labs/Solutech relationship was fruitful in the beginning, until Solutech stopped responding to Blaine Labs' emails, stopped making new orders, and failed to pay for completed orders.

196. In May of 2018, Solutech informed Blaine Labs that everything was "on hold" and "we are done." Solutech stopped placing orders and refused to pay outstanding invoices. As a result, on June 4, 2018, Blaine Labs properly treated this notification from Solutech as an abandonment of any rights Solutech had under the agreement and thus, on

that date, properly terminated the Solutech distribution agreement, with said termination effective 60 days after the notice of termination was sent.

197.   At the time Solutech thus abandoned Sil-K, Blaine Labs had more than 20,000 completed kits (four pads each) on hand that were unpaid for by Solutech.  This remaining inventory all contained labels including the Blaine Labs PMN Number and the Blaine Labs Patent Number which served as designations of origin and assurance of quality.

198.   Blaine Labs properly commenced to liquidate the remaining inventory in an effort to mitigate Blaine Labs' damages from Solutech's abandonment of the contract and abandonment of the inventory on hand.

199.   As of February 1, 2019, *i.e.*, the termination of the Share Exchange Agreement described above between Vivera and Blain Labs, there were approximately 80,000 such pads and 2800 completed kits in its inventory. Vivera, with Edalat and Karpinski acting in concert with it, unlawfully stole this remaining Sil K inventory by removing it and causing it to be removed from the Blaine Labs premises and moving it to a Vivera premises.

200.   From February 1, 2019 and thereafter, Vivera sold this remaining, stolen Sil-K inventory, which Vivera had stolen from Blaine Labs.  In so doing Vivera sold the Sil-K inventory utilizing Blaine Labs' FDA PMN (No. K001608).

201.   Use of the Blaine Labs PMN Number was needed for the continued sale by Edalat and Vivera of the stolen Sil-K pads because they provided purchasers with assurances of quality and origin.  However, the use of these numbers for sale of the stolen

property was false and misleading because the property was not in fact in any manner authorized or under the control of Blaine Labs.

202.   Thus, Edalat and Vivera, from February 1, 2019 and thereafter, by using the Blaine Labs PMN Number), illegally used a false designation of origin without authorization or permission.

203.   This false designation was used for the sale of stolen Sil-K product in interstate commerce.

204.   The unauthorized use of the PMN number was in connection with the sale of goods (Sil-K).

205.   The unauthorized use of the PMN number by Vivera was, and is, likely to cause confusion, mistake, and deception as to (a) the affiliation, connection, or association of Edalat and Vivera with Blaine Labs, or (b) as to the origin, sponsorship, or approval of Vivera's goods by Blaine Labs. This conduct constitutes unfair competition and false designation of origin in violation of the Lanham Act, 15 U.S.C. section 1125.

206.   Blaine Labs has been and is likely to be damaged continuously by loss of income by these acts in that Blaine Labs has been deprived of profits from legitimate sales of the Sil-K product and Blaine Labs has further suffered injury to its reputation for quality and professionalism from such sales activities; it has lost control of its reputation to a crooked and unscrupulous group, the Edalat Enterprise – who among other lies and frauds would market an ineffective Covid test to make money at the expense of the lives of any users of its fake and unapproved test, and has been damaged in the amounts to be

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

proved at trial for which Blaine Labs should be compensated as well as for all the ill-gotten gains received by Edalat and Vivera for these unlawful sales.

### SIXTH CLAIM FOR RELEIF

**Trademark Infringement, Unfair Competition, and Trade Dress Infringement for Sale of Revitaderm Products**

**(Brought by Blaine Labs against Vivera and Edalat)**

207.   The allegations of paragraphs 1 through 206 are adopted herein as though set forth fully herein.

208.   In or about 1995, Blaine Labs adopted the mark Revitaderm to identify its oil-based skin moisturizer product and to distinguish it from skin moisturizing products sold by others.

209.   On or about October 30, 1995, Blaine's Research Labs filed for a Federal Trademark for the wordmark Revitaderm with the USPTO.  The Trademark Application was published for opposition on or about March 7, 2000 and was issued under registration number 2444612 on April 17, 2001.

210.   The Trademark was assigned to Blaine Labs and Blaine Labs is the owner of record of the Revitaderm trademark listed with the USPTO.

211.   The registered trademarks "Blaine Labs" and "Revitaderm" are hereinafter collectively referred to as the "Revitaderm marks").

212.   Registration of these Revitaderm marks operates as constructive notice, to Edalat and Vivera and anyone else, of Blaine Labs' claim of ownership of them.

213.  Blaine Labs has used the Revitaderm Marks to identify Blaine Labs as the source for its products in the marketplace continuously since at least the registration of the Revitaderm marks.

214.  Blaine Labs has used the Revitaderm marks on its oil-based skin moisturizer in the United States ever since 1995, the date that the Blaine Labs adopted the Revitaderm marks, by, among other things, prominently displaying the Revitaderm marks on packaging for the product and in advertising for the product.

215.  Edalat and Vivera, and each of them, do not have permission to use the Revitaderm trademark or to advertise or offer to sell any products using the Revitaderm marks.

216.  From on or about January 31, 2019, and forward, continuing through the date of filing of this Complaint, Edalat and Vivera, and each of them, have, without Blaine Labs consent, reproduced and copied the Revitaderm marks and applied such reproduction and copy to labels, signs, and advertisements intended to be used and used in conjunction with the sale and distribution of oil-based skin moisturizer in interstate commerce by Vivera without the consent of Dr. Blaine or Blaine Labs.

217.  Such unauthorized use of the Revitaderm marks by Edalat and Vivera, and each of them, including without limitation, the creation and publication on or about January 31, 2019 of a YouTube video promoting Revitaderm and using these marks to do so.  The YouTube video remains active on the YouTube Platform as of the date of filing this Complaint. This YouTube Video makes clear that Edalat and Vivera intended to

BLAINE PARTIES' FIRST AMENDED COUNTERCLAIM

market Revitaderm in a manner confusing similar to the genuine and honest marketing of

Revitaderm by Dr. Blaine and Blaine Labs.

Blaine Labs Original Packaging and Mark:



Vivera Imitaion Packaging and infringing Mark:



218.  This use of the Revitaderm Marks is likely to cause confusion or mistake or to

deceive members of the public as to the source or origin of the moisturizing cream that are

sold or distributed in conjunction with the labels, signs, or advertisements used by Edalat and Vivera.

219. These actions by Vivera and Edalat constitute trademark infringement and unfair competition in violation of 15 U.S.C. section 1125(a)(1) and at common law as well as trade dress infringement under California common law.

220. Vivera and Edalat intended the labels, signs, videos, and advertisements containing the reproduction of the Revitaderm marks to cause confusion or mistake or to deceive the public as to the source of origin of the oil-based skin moisturizer they were selling.

221.  As a direct and proximate result of Edalat's and Vivera's infringement of the Revitaderm marks, as described above, Edalat and Vivera have derived profits in an amount currently unknown but believed to be in excess of $1,000,000 as will be subject to proof at trial.

222. As a further direct and proximate result of their infringement of the Revitaderm marks, as described above, Blaine Labs has sustained damages in an amount according to proof, consisting of lost profits from diverted sales and should be awarded the amount so proved along with all ill-gotten gains received by Edalat and Vivera from its sales.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SEVENTH CLAIM FOR RELIEF

## Trademark Infringement, Unfair Competition, and Trade Dress Infringement for Sale of ScarCare Products

### (Brought by Blaine Labs against Vivera, Edalat and SafeChain)

223. The allegations of paragraphs 1 through 222 are incorporated herein by reference.

224. As Edalat and Vivera were doing with other entities and remain doing as alleged above, they have now enlisted Counterclaim Defendant Safe Chain, operating nationwide, to distribute Blaine Labs' Scar Care products throughout its nationwide distribution network, including within this District.

225. These activities include use of the ScarCare trademark, and creation and use of packaging which copies the packaging of Blaine Labs for its ScarCare product, as seen below in a manner that is likely to cause confusion and is intended to do so.

226. The packaging is so similar that it is clearly shown to be an intentional imitation by Vivera and Edalat to the original packaging of Blain Labs and is intended to cause confusion.

227. Scar Care products bearing this counterfeit and confusingly similar packaging have been sent to SafeChain by Edalat and Vivera for distribution in the SafeChain network, including within this district. And Scar Care products bearing this counterfeit and confusingly similar packaging has been sent by Edalat and Vivera for market elsewhere.

228. The first packaging depicted below shows the deception:

75
BLAINE PARTIES' FIRST AMENDED COUNTERCLAIM

Blaine Labs Original Packaging:



Vivera/Edalat Immitation Packaging Used by SafeChain:



229. The unauthorized use of the ScarCare trademark and the PMN number by Edalat, Vivera, and Safe Chain in relation to their Scar Care distribution is likely to cause confusion, mistake, and deception as to (a) the affiliation, connection, or association of Edalat, Vivera, and Safe Chain with Blaine Labs, and (b) as to the origin, sponsorship, or approval of Vivera's goods by Blaine Labs. Such activity constitutes false designation of origin and unfair competition in violation of the Lanham Act, 15 U.S.C. section 1125 as well as common law trademark infringement, trade dress infringement, and unfair competition.

230. Blaine Labs has been and is likely to be damaged continuously by loss of income by these acts in that Blaine Labs has been deprived of profits from legitimate sales of the Scar Care products and Blaine Labs has further suffered injury and will continue to suffer injury to its reputation for quality and professionalism from such sales activities; it has lost control of its reputation to a crooked and unscrupulous group, the Edalat Enterprise – who among other lies and frauds would market an ineffective Covid test to make money at the expense of the lives of any users of its fake and unapproved test, and has been damaged in the amounts to be proved at trial for which Dr. Blaine and Blaine Labs should be compensated as well as for all the ill-gotten gains received by Edalat and Vivera for these unlawful sales.

231. Moreover, the continuing use in interstate commerce of the name, likeness, and trademark all associated with Blaine Labs by these Counterclaim Defendants will cause irreparable damage to the reputation, good will and trademarks of Dr. Blaine and Blaine

Labs and said damage cannot be adequately compensated by monetary damage; this irreparable damage will continue unless prevented by this Court.

232.     This Court should temporarily and permanently enjoin these Counterclaim Defendants from distribution or selling any of the Scar Care products.

## EIGHTH CLAIM FOR RELIEF

### For an Accounting

### (Brought by Blaine Labs against Vivera, Edalat, Karpinski and Verago)

233.     Dr. Blaine and Blaine Labs reallege and incorporate by reference the allegations contained in paragraphs 1 through 232 as though set forth fully herein.

234.   The exact amount of money due from Vivera, Edalat, Karpinski, and Verago as a result of all their wrongdoing stated in this Amended Counterclaim is unknown and includes at least:

(a) the amount of money wrongfully withdrawn and transferred to each of them from bank accounts owned and in the name of Blaine Labs;

(b) the amount of money Vivera has received from unauthorized subletting real property owned by Blaine Holding;

(c) the value of the products, equipment, supplies, resources, and devices owned by Blaine Labs which were converted by Vivera, Edalat, Karpinski, and Verago;

(d) sales of the stolen Sil-K products and profits therefrom;

(e) sales of the Revitaderm products and profits from such sales; and

(f) sales of the ScarCare products and profits from such sales.

78

235.  Dr. Blaine and Blaine Labs cannot ascertain the total amount owed to them without receiving an accounting from each of Edalat, Vivera, Karpinski and Verago for the period from September 28, 2018 – the date on which the Share Exchange Agreement was executed – through the present.

236.  The Blaine Labs is entitled to an accounting from each of Edalat, Vivera, Karpinski and Verago.

## **PRAYER FOR RELIEF**

Wherefore, Blaine and Blaine Labs respectfully pray that this Court grant the following relief against Edalat, Vivera, Karpinski, Verago and Barghi and Safe Chain but as to Safe Chain only in relation to Count Seven:

1.      Compensatory, general and special damages jointly and severally against all of them in the amount to be proven at trial;

2.      Treble damages against all of them as allowed by law.

3.      Temporarily and permanently enjoining Edalat, Vivera and Safe Chain from distributing or selling or offering to distribute or to sell any of the Scar Care products referred to in this Amended Counterclaim;

4.      Ordering a complete accounting of the goods and funds wrongfully converted and retained by Edalat, Vivera, Karpinski, Verago and Barghi and for all profits they and Safe Chain have made from the improper sale of any product using the trademarks and trade dress of Blaine Labs in the manner alleged in this Amended Counterclaim;

5.      Attorney's fees and taxable costs as allowable by law on any of the Counts

stated above

6.     For such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMAND**

Dr. Blaine and Blaine Labs hereby demand a jury trial on all issues so triable within the meaning of Rule 38, Fed. R. Civ. Pro.


Dated: September 2, 2021          Respectfully submitted,

MARKHAM READ ZERNER LLC

By: */s/ John J. E. Markham, II*
        John J. E. Markham, II

BLAINE PARTIES' FIRST AMENDED COUNTERCLAIM

## __CERTIFICATE OF SERVICE__

Commonwealth of Massachusetts, County of Suffolk

I am employed in the county and state aforesaid. I am over the age of 18 and not a party to the within action.  My business address is One Commercial Wharf West, Boston, Massachusetts 02110.

I hereby certify that on this date this document was served by electronic delivery through the CM/ECF system on the registered participants as identified on the Notice of Electronic Filing, which will forward copies to Counsel of Record.

For parties requiring personal service, appropriate proofs of service will be filed upon return.

Executed on September 2, 2021 in Boston, Massachusetts.

*/s/ Bridget A. Zerner*
Bridget A. Zerner

BLAINE PARTIES' FIRST AMENDED COUNTERCLAIM